1  Andrew W. Hutton (172033)
   drew@law-hutton.com
2  HUTTON LAW GROUP
3  12671 High Bluff Drive, Suite 130
   San Diego, CA 92130
4  Telephone:   (858) 793-3500
   Facsimile:   (858) 793-3501
5
6  Timothy J. Tatro (175633)
   tim@tatrozamoyski.com
7  TATRO & ZAMOYSKI, LLP
8  12760 High Bluff Drive, Suite 210
   San Diego, CA 92130
9  Telephone: (858) 244-5032
   Facsimile: (858) 847-0032

10 Attorneys for Plaintiff

11

12          **IN THE UNITED STATES DISTRICT COURT**

13            **SOUTHERN DISTRICT OF CALIFORNIA**

14 | Larry D. Klevos, individually and on | CASE NO. **'17 CV0492 JAH  WVG** |
   | behalf of all others similarly-situated, | |
15 | | **CLASS ACTION** |
16 | Plaintiff, | |
17 | v. | **COMPLAINT** |
18 | Voya Insurance and Annuity Company, | |
19 | and Voya Financial, Inc. | **DEMAND FOR JURY TRIAL** |
20 | Defendants. | |

21

22

23

24

25

26

27

28

Plaintiff Larry D. Klevos brings this complaint, on behalf of himself and other similarly situated persons or entities against defendants Voya Insurance and Annuity Company ("ING/Voya") and Voya Financial, Inc ("Voya").   Mr. Klevos seeks certification of the following Class:   "All persons or entities that, while a resident of California and within the applicable statute of limitations, purchased from ING USA Annuity and Life Insurance Company or Voya Insurance and Annuity Company a Secure Index equity indexed annuity investment with initial and/or additional premium."   Upon information, belief and investigation of counsel, Plaintiff asserts the following:

Count 1:    Breach of fiduciary duty (against ING/Voya) and aiding and abetting (against Voya);

Count 2:    Violation of Cal. Welf. & Inst. Code §§ 15600, *et seq.* (Elder Abuse and Dependent Adult Protection Act) (against Defendants);

Count 3:    Violation of the California Insurance Code (against ING/Voya); and

Count 4:    Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and 17500, *et seq.* (against Defendants);

## **OVERVIEW**

1.    Defendants target retirees and senior citizens with the sale of arcane "Secure Index" annuity contracts.  The Secure Index investment is known variably as an "equity-indexed annuity," "EIA," "fixed-indexed annuity" or "FIA."

2.    EIAs are atypical annuities.  Unlike vanilla "fixed annuities" that pay a fixed interest rate, EIAs have a "link" – created by Defendants – that operates to credit interest to the investments' values based on performance of an underlying equity index, such as the S&P 500 Index.

3.    The Secure Index "link" is created by Defendants in two parts.  First,

1    Defendants value and effectively sell exotic options to Plaintiff and the Class in the
2    form of contract "Strategies." *See* Ex. A, §6.  Voya sets the price and value of this
3    embedded option or Strategy by establishing various rates, caps and spreads
4    ("Strategy parameters").  This exotic option embedded in the contract's Strategies
5    forms an undisclosed counterparty relationship between the retiree and the
6    Company whereby the retirees' gains are the Company's losses, and vice versa.

7        4.     Second, to offset or "hedge" the Company's direct obligation to
8    Plaintiff and the Class under the exotic options or "Strategies" (i.e., Strategy
9    value), Defendants purchase options and other derivatives (the "Hedge").  The
10    value of the options and derivatives in both the Strategies and the Hedge are highly
11    variable at any given point in time, and their values depend on current market
12    conditions, such as that day's interest rates and that day's market volatility.  The
13    existence and market values of the Strategy/Hedge are not disclosed to Class
14    members, and are not disclosed to sales agents or customer-facing personnel.

15        5.     The Strategy/Hedge is extraordinarily complex and very difficult for
16    Defendants to properly manage and administer.  For example, because certain
17    Strategies are highly exotic, Hedges may not be available in the market place,
18    thereby affecting the pricing of the investment's "link."  That is, because
19    Defendants are unable to accurately Hedge the Strategies, they may reduce the
20    Strategies' values to limit their exposures under the contract.  Also, given the
21    variability of options and their pricing, a Strategy parameter may have a strong or
22    valuable "link" to the S&P 500 Index one day, but the next day the value of that
23    same Strategy parameter may have a weak, meaningless "link" to the S&P 500
24    Index, thereby hurting the retiree's investment.

25        6.     Under these circumstances, Defendants do not execute and manage
26    the investments individually but must do so in broad groups without regard to an
27    individual retiree's investment values.  This material fact is not disclosed to Class
28    members, sales agents or Defendants' customer-facing personnel.

7.     Retirees generally seek "guaranteed" investments that generate meaningful income benefits because retirees worry about inflation and out-living their savings.  Therefore retirees chase yield on their investments and find the Secure Index "link" to the equity markets attractive, particularly in a low interest rate environment where bank investments generate low yields that may not keep up with inflation.  As Defendants' head of annuity sales explained in 2012:  "[EIAs] are not designed to beat the market, they are designed to **beat the bank**.  So with interest rates being so low, we've seen a shift toward selling more of the **income benefits** on the [EIA] products."[1]

8.     The ability of the Secure Index "link" to provide "income benefits" that "beat the bank" also follows an investment axiom that low interest rates can fuel increases in equity prices.  For example, since 2009 interest rates have plummeted to historic lows, while during the same time, the S&P 500 Index has more than doubled in value, climbing to historic highs.

9.     Defendants' Secure Index marketing targets retirees and seniors, deliberately emphasizing the investments' valuable correlation or "link" to the S&P 500 Index.  For example, Defendants claim that the Secure Index contracts are long-term investments suitable for retirement savings, with attractive features and benefits, including a "**guarantee**" to "**Protect Your Assets**" while "**Fueling the value of your annuity**."

10.     The Secure Index contracts can meet these investment objectives of "guaranteed" "protection" and "fueled" income benefits, so long as the contracts have a strong, valuable correlation to S&P 500 Index performance.  Reasonable investors would believe that "with interest rates being so low," the Secure Index contracts are valuable long-term investments because their earnings would "beat

---

[1]  Wood, M., *ING's Tope: "We've Always Had a Very Strong Indexed Annuity Business"* (May 2012) (emphasis added) http://www.lifehealthpro.com/2012/05/18/ings-tope-weve-always-had-a-very-strong-indexed-an.

1   the bank," capitalizing on positive performance of the S&P 500 Index.

2        11.    Without a valuable "link" to the S&P 500 Index, the Secure Index
3   contract is a poor investment because its earnings do not keep pace with risk-free
4   returns, inflation or commensurate investments that are safer and more liquid.
5   Under these circumstances, the value of the Secure Index investment is not
6   "protected" and does not provide income benefits that "beat the bank."

7        12.    With little connection to the S&P 500 Index, the investment is
8   effectively a promissory note from ING/Voya that pays less-than a risk-free rate of
9   return.  In contrast, U.S. government instruments, such as the Treasury Note (a
10  proxy for a risk-free rate), not only pays higher interest, it poses far lower risk of
11  default than ING/Voya.

12       13.    Of greater consequence to the value of the investments' embedded
13  derivative.  Defendants adjust the Strategy parameters (caps, rates, spreads) like
14  knobs or levers that can be turned up or down to increase or decrease the contracts'
15  income benefits and investment values.  Defendants are the only party to the
16  investment that can adjust these knobs or levers in a manner that will "protect"
17  retirement savings, "fuel" investment value, provide "income benefits" that "beat
18  the bank," and treat retirees and seniors fairly.

19       14.    However, the investment is a wolf in sheep's clothing.  Defendants
20  do not adjust the knobs or levers to provide retirees a "link" based on performance
21  of the S&P 500 Index that will "protect" and "fuel" Class members' retirement
22  savings.  Instead, unbeknownst to the Class, Defendants adjust the derivatives'
23  knobs and levers based on first meeting Defendants' internal spreads and profit
24  targets to benefit their shareholders.

25       15.    Defendants overreach in their management and execution by taking
26  more than fair compensation for the investment, by disregarding performance of
27  the S&P 500 Index or capital market conditions and interest rates, and without
28  regard to whether Class members' retirement savings are actually being

"protected" or "fueled."

16.     Defendants' execution of the investment, and their self-dealing and self-interested investment management practices cause the retirement savings to lose value even when the S&P 500 Index increases, particularly in a low interest rate environment.

17.     Many Class members have reasonable expectations that their Secure Index investments are performing well, generating earnings and increasing in value, based on news reports of record increases in the S&P 500 Index.  But these Class members are sorely disappointed when they open their annual statements to find "$0.00" interest credits for their retirement savings, as they see the value of their retirement savings decline.

18.     A retiree cannot check the newspaper or call her broker to get a price or fair value for the Secure Index investment, to see if the investment is managed properly by Defendants.  Even Defendants' customer service representatives have no idea how the Secure Index contracts are priced or valued, or what the fair value of the contracts are at any point in time.  The retiree must rely entirely on Defendants to fulfill Class members' investment objectives by properly managing the investment and accurately reporting values.

19.     Defendants reassure Class members upon contract delivery that they are a "***Valued Client***" and although the investment was a "***big decision***," ING/Voya is their faithful "***preferred financial services provider***" and that ***"[o]ur commitment to you does not end*** at the issuance of your enclosed contract. Rather, ***our commitment to you begins***."  ING/Voya concludes the letter to Class members: "***Again, thank you for the trust and confidence*** you have placed with us." Ex. A (emphasis added).

20.     Defendants, however, are not faithful investment stewards.  For example, ING/Voya is a derivatives counterparty to Class members, where Class members' losses are effectively the Company's gains.  Likewise, ING/Voya has

5

1    material conflicts of interest with the Class of retirees because it manages and
2    executes the investments so that ING/Voya can benefit Defendants, to the
3    detriment of the Class.

4        21.    For example, in form filings with the California Department of
5    Insurance ("CDI"), ING/Voya committed that it would, each year, provide a
6    market value for the Strategy Value of *at least* 100 basis points ("bps") or more of
7    the contracts' accumulation value.    Defendants routinely shortchanged Class
8    members by not providing *at least* these minimum Strategy Values *and more*, as
9    they told the CDI they would do.    Defendants shortchanged Class members
10   because they were overreaching, taking too much investment value away from the
11   Class of retirees.

12       22.    The diagram below at ¶ 26 depicts an example of how ING/Voya sets
13   the derivatives' knobs or levers of the Strategy Values during the contract term.
14   After the retiree invests their savings ($100,000 in this hypothetical), ING/Voya
15   pays the agents' commissions ($7,000), leaving a net amount of funds ($93,000) to
16   be managed by ING/Voya for the benefit of the retiree.    ING/Voya then invests
17   those savings, and the earnings from those investments are available to fund the
18   call options that will provide the Class members' "link" to the S&P 500 Index.

19       23.    If the investment portfolio were to yield 5%, that would generate
20   $4,650 in funds that are available to purchase the call options that will determine
21   the Strategy Values for the benefit of the retiree.    However, in the example below
22   at ¶ 26, declining interest rates have caused the investments to yield only $2,790.

23       24.    If ING/Voya were to provide the retiree a Strategy Value of $2,000
24   (200 bps) on this limited options budget ($2,790), ING/Voya could not recover the
25   pro-rata portion of commissions it had paid and would not take any profit.    If
26   ING/Voya were to provide the retiree a lower Strategy Value of $1,000 (100 bps or
27   the bare minimum represented to the CDI), ING/Voya could take $1,790 to cover
28   expenses and profit (e.g., $1,000 for commissions and $790 for profit).

25.    Instead, ING/Voya abuses its investment discretion and pricing duties by not meeting minimum Strategy Value and/or by transmitting market risks in unmitigated fashion.  For example, instead of absorbing the market-related risks that investment yields might fall (e.g., from 5% to 3%), Defendants remain fixated on their pre-determined $2,500 "spread" and profit targets, regardless of market conditions, leaving only $290 (or 29 bps) to do the (inadequate) job of funding Strategy Values and capturing increases in the S&P 500 Index for the benefit of the retiree.

26.    By fixing its pre-determined targeted "spreads" and profits, unwilling to bear the market risks of declining interest rates and other factors, Defendants fully transmit those market risks to Class members who lose investment value because they receive lower Strategy Values that are not protected:



27.    Defendants are capable of providing far more than 100 bps in equivalent Strategy Value (instead of only 29 bps in the example).  To do so, Defendants would need to absorb the market risk of reduced yields (and not transmit those risks to Class members).

28.    Plaintiff estimates that ING/Voya provided Mr. Klevos with a Strategy Value equivalent to as little as 29 bps when ING/Voya set his Monthly Cap rate at 1.60%.  Had ING/Voya set the higher Monthly Cap rate of 2.64% to reflect an bare minimum value of 100 bps, as was represented to the California Department of Insurance, as of January 2016, *Mr. Klevos' Secure Index contract values would be about $15,000 higher (on his $105,000 investment that was made in 2011)*.

|   | | **Class Member realizes Risk** | **ING/Voya realizes Risk** |
|---|---|---|---|
| *A* | Retiree Investment | $100,000 | $100,000 |
| *B* | Commissions/acquisition costs | $   7,000 | $   7,000 |
| *C* | Funds for Investment, net of costs *(A – B = C)* | $ 93,000 | $ 93,000 |
| *D* | Investment Portfolio yield | 3.00% | 3.00% |
| *E* | Funds for Options/Strategies *(C x D = E)* | $   2,790 | $   2,790 |
| *F* | ING/Voya Profit/"spread" | $   1,500 | $      790 |
| *G* | ING/Voya recovers acquisition costs | $   1,000 | $   1,000 |
| *H* | Est. Options/Strategy Value *(E – F – G = H/A)* | $290 (29 bps) | $1,000 (100 bps) |
|   | Klevos' Monthly Cap Rate | 1.60% | Est. 2.64% |
|   | Klevos' Improved Investment Value over 5 years | $0 | Est. $15,000 |

29.    ING/Voya's overreaching and low Strategy pricing is not speculative and the above analyses are not academic.  Back-testing the pricing parameter (i.e., Monthly Cap rate of 1.60%) against actual historical S&P 500 Index movements and contemporaneous risk-free rates of returns verifies that Defendants' pricing does not fulfill the investments' objectives.  That is, at the purchase date, the Strategy Value's "Monthly Cap" rate of 1.60% had <u>historically</u> provided an annual

return of on average *__far less than__ the risk-free returns of the 5-year U.S.* *Treasury*.[2]  Defendants had been selling this product for years and could have easily back-tested this valuation parameter for the Index Strategy, revealing investment alternatives that were far less expensive, far safer, and offering superior returns.

30.    Given the Secure Index contracts' extreme complexity and capacity to transfer market risk from the issuer to the investor, FIAs are sometimes registered as securities.[3]  In fact, Defendants' related entities have registered very similar FIA contracts as securities with the Securities and Exchange Commission. Defendants' registered FIAs are similar in design, execution and investment management to the Secure Index contracts at issue here.

31.    Defendants, however, do not register the subject Secure Index contracts as securities.  Therefore, Defendants know (through rules governing the broker-dealers that they supervise and control) that since 2005 the securities industry has adopted a "***seller beware***" attitude and standard towards the sale of <u>unregistered</u> indexed-annuities, like the Secure Index contracts here.[4]

32.    Defendants have never employed or adopted a "***seller beware***" attitude or standard towards either the design, agent training, marketing, sale,

---

[2]    Mr. Klevos' Jan. 2011 Monthly Cap rate of 1.60%, when applied against thousands of historical S&P 500 Index scenarios, was constantly outperformed by the risk-free 5-year U.S. Treasury rate.

[3]    Koco, *A Registered Index Annuity Takes Off* (2014), http://insurancenewsnet. com/innarticle/A-Registered-Index-Annuity-Takes-Off-a-476609.

[4]    Defendants sell <u>unregistered</u> Secure Index contracts through various distribution channels, including broker-dealers, who are members of the NASD/FINRA.  *See* Notice to Members No. 05-50 (Equity-Indexed Annuities – Member Responsibilities for Supervising Sales of Unregistered Equity-Indexed Annuities); Regulatory Notice 12-03 (Complex Products – Heightened Supervision of Complex Products); "Sellers Beware:  FINRA's New Suitability Rule and the Sale of Complex Investments."  http://www.wilsonelser.com/writable/files/marasciullo_ finra_suitability.pdf.

disclosure process, valuation, pricing, investment management, administration or execution of the <u>unregistered</u> Secure Index contracts.  For the same reasons, Defendants did not have a reasonable basis to recommend to Class members that the Secure Index contracts were suitable for retirement savings.

33.    Had the Defendants employed "***seller beware***" and "***reasonable basis for suitability***" standards towards the sale of Secure Index contracts by, for example back-testing the pricing parameters (e.g., testing the propriety of a "Monthly Cap" rate of only 1.60%) against historical risk-free rates of return, training agents to do so, and training agents about the existence and behavior of the embedded derivatives, it would be plain to see that the Secure Index investments are immediately in jeopardy, unprotected, subject to unmitigated market risks, and wholly unsuitable for retirement savings.

34.    Defendants' contract execution and investment mismanagement caused Plaintiff and the Class to grossly overpay for their Secure Index contracts because, as executed and managed, the contract has very weak correlation to the S&P 500 Index.  Class members have lost on average 15%-20% of the value of their retirement savings on the date they purchased their Secure Index contract.[5]

35.    Once a Class member has purchased a Secure Index contract, they are trapped.  Either the Class member stays in the under-performing, illiquid long-term investment, or the Class member surrenders the contract early, but suffers punishing early termination charges.  Either way, Class members are losing significant retirement savings value (to Defendants' benefit) as a result of Defendants' misconduct.

36.    This is not a matter of Defendants taking a fair, commercially-

---

[5]  Plaintiff reserves the right to refine these valuations to conform to evidence and discovery.  For purposes of this pleading, this range is consistent with the sum of Defendants' acquisition costs (e.g., commissions) and Defendants' pre-determined, corporate-mandated profit target (after expenses).

reasonable payment to cover their investment management fees.    Defendants execute the Secure Index contract and manage Class members' investments with the objective of benefiting their shareholders first, not the Class of retirees and seniors that they are duty-bound to protect.  As a result, Secure Index investment returns have lagged far behind the S&P 500 Index, to the benefit of Defendants and their shareholders.  As depicted in the following Voya investor presentation, while Class members' investment returns are flat and hover around the horizontal "0%" axis, Voya's investment values are "protected" and "fueled," well beyond the returns of the S&P 500 Index, and even beyond the returns at peer insurance companies that sell EIAs:



**PARTIES**

37.     Plaintiff Larry D. Klevos is a retired teacher, senior citizen and resident of Orange, California.   In 2011, Mr. Klevos paid Defendants over $105,000.00 for a Secure Index contract issued by ING/Voya.

38.     Defendant Voya Insurance and Annuity Company ("ING/Voya") is organized under the laws of Iowa, with its home office located at 909 Locust Street, Des Moines, Iowa, 50309.  ING/Voya offers various insurance contracts, dominated by its annuity business.  ING/Voya's primary annuity customers are individuals seeking financial solutions for retirement that include principal protection and income benefits.

39.      Defendant Voya Financial, Inc. is organized under the laws of Delaware, with its home office located at 230 Park Avenue, New York, New York, 10169.  The stated aim of Voya Financial, Inc. is to be "America's Retirement Company."   Within the organization of Voya Financial, Inc. is one of the top twelve broker-dealers in the United States, a member of NASD and now FINRA. The claims against defendant Voya Financial arise out of the same conduct, transactions, or occurrence as those claims brought against ING/Voya.

**JURISDICTION AND VENUE**

40.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff (citizen of California) and Defendants (citizens of Iowa and New York) are citizens of different states and the amount in controversy exceeds $75,000 for Plaintiff (exclusive of interest and costs) and/or the amount in controversy for the Class exceeds $5,000,000.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

41.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, related litigation is pending in this district; Class members received the false and misleading promotional materials in this district; Class members entered into Secure Index contracts in this district; Defendants mailed Secure Index contracts

into this district.  Moreover, Defendants have sought approval to sell Secure Index contracts in the State of California and Defendants manage several hundred million dollars' worth of Secure Index contracts in California, much of it within this district.

## FACTS PERTAINING TO PLAINTIFF LARRY D. KLEVOS

42.    In 2001, Mr. Klevos paid $140,438.02 for a fixed annuity contract issued by ING USA Annuity and Life Insurance Co. (or its predecessor), contract no. ****4059.  This fixed annuity paid Mr. Klevos about 6.5% interest annually for a period of ten years.

43.    In or about January 2011, while Mr. Klevos was a California resident and senior citizen, ING/Voya presented Mr. Klevos with an application and/or disclosure forms for a Secure Index contract to be issued by ING/Voya.  At that time, Mr. Klevos was not presented with the Secure Index contract, but was asked to complete the Secure Index contract application and/or disclosure forms drafted by the Defendants that were a condition of contract issuance.

44.    In January 2011, ING/Voya caused Mr. Klevos to "replace" or transfer over $83,000 from his existing ING USA fixed annuity (that paid 6.5% guaranteed interest annually) to fund the purchase of a poorly-performing Secure Index contract.  Days later, Mr. Klevos paid ING/Voya $84,980.00 in exchange for a Secure Index Five flexible premium contract, issued by ING/Voya and dated January 20, 2011, contract no. ****3536.  The contract was drafted by Defendants, was non-negotiable, and was not registered as a security in the state of California. *See* Ex. A.

45.    In addition to accepting Mr. Klevos' contract payment, Defendants accepted Mr. Klevos' investment application, disclosure forms and related acknowledgments (including the acknowledgments of the Defendants' appointed sales agent) as a condition of contract issuance.

46.    Upon issuance of the Secure Index contract, ING/Voya reassured

Mr. Klevos that Defendants would faithfully manage his investment as his "***financial services provider***" and do so in the best interests of Mr. Klevos, adding: "***Again, thank you for the trust and confidence you have placed with us***."  Ex. A.

47.    On or around the contract date, Mr. Klevos chose the Secure Index contract's Monthly Cap "Strategy."  ING/Voya set the Strategy Value with a Monthly Cap rate at 1.60%.  This rate was non-negotiable and was established by ING/Voya in connection with its investment management and financial advisor duties owed to Mr. Klevos.  Defendants did not provide Mr. Klevos with the investment's minimum market values of equity indexed benefits based on a Monthly Cap rate of 1.60%, and Mr. Klevos was also not given alternative Strategy Value parameters on the Contract Data Page (for comparison purposes), as Defendants had represented to the California Department of Insurance that they would do.

48.    Defendants did not back-test the pricing and values of Mr. Klevos' Strategy Value, or other values, based on a 1.60% monthly cap.  Had Defendants back-tested the Monthly Cap rate of 1.60%, they would know that the Strategy Value as priced was highly unlikely to protect Mr. Klevos' investment or generate interest credits that would out-perform risk-free rates (i.e., Treasuries) or otherwise "beat the bank."

49.    Alternatively, Defendants already knew or should have known, by virtue of their long history selling and executing Secure Index contracts, and by their reporting to Voya shareholders of the Strategy Values owed to Class members (at their fair market valuations), that the Secure Index contract with the Strategy Value as priced for Mr. Klevos had very low valuations that made the Secure Index contract unsuitable for long-term retirement savings or lifetime income.

50.    In fact, based on thousands of scenarios using a Monthly Cap rate of 1.60%, in good and bad equity markets, there was an extremely high likelihood

that Mr. Klevos would not earn an equivalent risk-free rate of return on his investment with Defendants, and a high likelihood he would earn less-than risk-free rates of return.  Thus, this low Monthly Cap rate of 1.60% left Mr. Klevos' investment unprotected, highly unlikely to "beat the bank," and inferior to investments that were both safer and more liquid than the Secure Index contract.

51.    In the process of setting the Monthly Cap rate for Mr. Klevos' contract, ING/Voya failed its investment management and financial advisor duties that it owed to Mr. Klevos because the Monthly Cap rate of 1.60% was based on a methodology where Defendants would first deplete funds created for the benefit of Mr. Klevos and other Class members, and use those funds to achieve Defendants' pre-determined and mandated profit targets/spreads, and to reimbursement Defendants' sales expenses, business costs, and other losses.

52.    Therefore, the Monthly Map rate of 1.60% was not based on performance of the S&P 500 Index or capital market conditions, but was based on Defendants' profit objectives, "spreads," financial performance, losses and risk of losses, profit targets, competitive position and acquisition expenses.  Based on current estimates, ING/Voya should have set Mr. Klevos' initial Monthly Cap rate to at least 2.64% at the purchase date in order to meet a market Strategy Value of 100 bps of the contract's Accumulation Value, as Defendants had represented to California Department of Insurance.

53.    As a result of the hidden derivative and hedging structure that is based on Defendants first achieving their preset spreads and corporate profit targets, Mr. Klevos significantly overpaid for his Secure Index, losing an estimated 13% of value of his initial $84,980 investment on the purchase date.  This loss was a result of Defendants' improperly managing Mr. Klevos' investment and setting the Strategy Value parameters unfairly and contrary to the interests of Mr. Klevos. Defendants also had no reasonable basis for their recommendation to purchase the Secure Index contract, particularly with the "replacement" of an existing annuity

that was earning higher, guaranteed returns. Had Mr. Klevos been made aware of these material facts, he would <u>not</u> have purchased the Secure Index contract.

54.    In or about October 2011, ING/Voya caused Mr. Klevos to terminate his ING USA fixed annuity contract no. ****4059. Upon termination, on October 28, 2011, Defendants applied the fixed annuity contract's net proceeds of $20,020.82 to pay "additional premium" into the Secure Index contract (no. 90383536).

55.    The "additional premium" amount of $20,020.82 paid by Mr. Klevos on October 28, 2011 was treated and managed by Defendants as a new investment of the Secure Index contract, and Defendants set a new Monthly Cap rate of 1.40% for that portion that was accounted for separately.

56.    Plaintiff estimates that the Monthly Cap rate needed to provide at least 100 bps of equivalent options value would have been as least 2.72% on October 28, 2011 – not the low 1.40% that was set by the Defendants. Plaintiff also estimates that the Monthly Cap rate of 1.40% was equivalent to a low as 19 bps of value.

57.    Similar to Mr. Klevos' initial investment, Defendants did not back-test the pricing and values of Mr. Klevos' contract based on a Monthly Cap rate of 1.40% for the additional premium. Had Defendants back-tested Mr. Klevos' Strategy Value at the Monthly Cap rate of 1.4%, they would have clearly seen that the Monthly Cap rate as priced was highly unlikely to protect Mr. Klevos' investment or allow him to "beat the bank."

58.    In the process of setting this Monthly Cap rate for Mr. Klevos' contract, ING/Voya failed its investment management and financial advisor duties because the Monthly Cap rate of 1.40% was based on a methodology allowing Defendants to first deplete funds created for the benefit of Mr. Klevos and other Class members, and use those funds to first reimburse Defendants' sales expenses and also achieve Defendants' pre-determined spreads and profit targets.

59.     Therefore, the Monthly Cap rate of 1.40% for the "additional premium" of $20,020.82 was not based on the performance of the S&P 500 Index, but was based on Defendants' financial performance, "spreads," investment losses and risk of losses, operating expenses, profit targets, competitive position and acquisition expenses.

60.     For both of Mr. Klevos' investments in the Secure Index contract, Defendants did not employ or adopt a "***seller beware***" attitude or standard towards the <u>unregistered EIA</u>, and likewise lacked "***reasonable basis suitability***" for both the transaction and proceeding with the depletion of savings and effective "replacement" of Mr. Klevos' previous fixed annuity that had paid about 6.5% annually, guaranteed.    Defendants lacked a reasonable basis for their recommendation and advice that the transaction was suitable for retirement savings because Defendants had contemporaneous actual and/or constructive knowledge that the new Secure Index contract would not and could not provide a meaningful investment return relative to other investments that were less expensive, more liquid, and safer investment options.

61.     On the dates each Secure Index investment was made, ING/Voya set the investment price and Strategy Value through its declaration of the investment parameters under § 6 of the contracts.

62.     In or about early 2012, ING/Voya issued to Mr. Klevos an Internal Revenue Service Form 5468 that reported the year-end 2011 "Fair market value of the account" as $104,737.82.  This Form 5468 was false and misleading because the investment's fair value was far lower than the reported amount as a result of Defendants' overreaching in its management of the Secure Index contract.

63.     Had Defendants properly managed the investment and fulfilled financial provider duties, the contracts' guaranteed Accumulation Values and Cash Surrender Values would have been reported differently and in higher amounts, and higher cash withdrawals would have been available.

17

64.    In mid-2016, Mr. Klevos first learned that Defendants had engaged in the wrongful conduct that is alleged herein.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### Defendants Seek Approval from the California Department of Insurance

65.    In 2006, Defendants sought approval from the California Department of Insurance for purposes of selling Secure Index contracts in California.   In connection with this process, ING/Voya submitted standardized and uniform policy forms and related supporting documentation for the proposed Secure Index contracts (including Forms IU-IA-3033) that described how Defendants would manage the Secure Index investments for the benefit of contract holders.

66.    The Secure Index form approval application indicated that the Secure Index contract is an FIA and earns Index Credits "based on performance of the S&P 500 Index."   The applications did not provide for alternative "bases" of calculating the Strategy Value, for interest-crediting, or for managing the investment.   For example, the applications do not describe Defendants' pricing practices that were "based on" a methodology of first meeting Defendants' targeted spreads, profits and reimbursements, before the Strategy Value parameters are determined for the benefit of Class members.

67.    Defendants represented to the CDI that the spreads, rates and caps for the Index Strategies ("Strategy Value parameters") would be shown on a "spec page" in their current values, referring to the contracts' Contract Data Page. Defendants did not fulfill this representation in connection with executing the Secure Index contracts.   Without this information, Class members were unable to compare Strategy Value parameters for their investment.

68.    Defendants represented to the CDI that the Strategy Value parameters would be set such that the annualized equivalent option cost for the Strategy Value would be a least 100 bps based upon the contracts' Accumulation Values and Strategy parameters.   Defendants did not fulfill this representation in connection

1   with executing the contracts and managing Class members' investment.  By setting

2   the Strategy Values parameters at less than 100 bps equivalent options values,

3   Class members' investment values and contract "income benefits" suffered.

4        69.    Defendants represented to the CDI that income received from

5   exercising call options at the end of a premium year would be used to fund the

6   Index Credit as defined in the contract.   Defendants did not fulfill this

7   representation in connection with executing the contracts and managing the

8   investment.  By not providing Class members the value of options proceeds, Class

9   members' investment values and contract "income benefits" suffered.

10       70.    Defendants represented to the CDI that the Strategy Value parameters

11   are set according to changes in market conditions.  Defendants did not fulfill this

12   representation in connection with executing the contracts and managing the

13   investment because Defendants set the Strategy parameters according to their

14   targeted spreads and profits, without regard to "market conditions."  By not setting

15   Strategy parameters for the benefit of Class members and according to market

16   conditions (such as volatility, credit risk, and interest rate conditions), Defendants

17   violated their investment management and financial advisor duties to Class

18   members.

19   **Defendants Target Seniors/Retirees Seeking Savings Protection and Income**

20       71.    The Secure Index contract is designed to be, and is marketed as, a

21   suitable long-term retirement investment that is protected from market risks and

22   can "beat the bank" through increases in investment value based on positive

23   performance of the S&P 500 Index.  Targeting of retirees and seniors includes

24   locating retirees with existing annuity contracts with significant cash values, or

25   similarly, homeowners where existing credit or sources of cash (such as reverse

26   mortgages) can be tapped to purchase the Secure Index contracts.

27       72.    As interest rates have fallen, the Secure Index contract grew in

28   popularity with retirees and seniors because the Secure Index contract was both

marketed and perceived as an investment that had income benefits that would "beat the bank" and provide "income benefits" through a meaningful link to performance of the S&P 500 Index.

73.     As explained by Defendants in their financial reports filed with the Securities and Exchange Commission, the Secure Index contracts are marketed as an attractive retirement solution for its target market of seniors and retirees:  "FIAs are marketed principally based on underlying interest-crediting guarantee features coupled with the potential for increased returns based on the performance of market indices. . . .  Our target market for annuities include individual retirees and pre-retirees seeking to accumulate or receive distributions of assets for retirement." *See* Voya Form S-1/A, Mar. 18, 2014, at 215-16.

**"Secure Index" Value Proposition, Marketing Message and Income Benefits**

74.     Defendants' create uniform marketing materials that appeal to the target market of seniors and retirees as suitable retirement investments that generate superior earnings "linked" to the S&P 500 Index under brand names "Secure Index Opportunities Plus," "Secure Index Five," and "Secure Index Seven."

75.     Defendants created uniform sales materials that offered retirement solutions for retirees, including "***Mapping Your Retirement Destination***," which asked "***Where will retirement take you?***" while promising attractive benefits, including a "***guarantee***" to "***Protect Your Assets***" while "***Fueling the value of your annuity***," and various creative "***interest crediting strategies***" linking the annuities' earnings to "***the premier benchmark for U.S. stock market performance***" – the S&P 500 Index.  Defendants targeted retirees and senior citizens with statements that the beneficial "***interest crediting strategies***" tied to the S&P 500 Index "***provides you . . . with interest potential***" beyond **"*other sources of fixed income like savings accounts, certificates of deposit and savings bonds*.**"

76.    The uniform marketing materials omit material facts about Defendants' contract execution and investment management practices, including material facts that interest credits and Strategy Values are not based on the performance of the S&P 500 Index, but instead are based on Defendants' achieving pre-established spreads, internal profit targets, and reimbursement of expenses and losses.    A condition of contract issuance is the appointed sales agent's acknowledgment that their representations to Class members were consistent with the above marketing pitch (that was false and misleading, and that omitted facts that would be material to a reasonable investor trying to make an informed investment decision).

**The Secure Index Contracts' Strategy Values**

77.    The contracts' mechanism for participation in the S&P 500 Index is the contracts' index "Strategies," whereby positive performance of the S&P 500 Index will result in "Interest/Index Credits" under the contract.

78.    The "Interest/Index Credits" are added to the contracts' "Accumulation Value," a contract value guaranteed by ING/Voya and representing an accumulation of the initial (and any additional) premium received from the Class member, plus "Interest/Index Credits" earned through participation in the S&P 500 Index, less adjustments for any partial surrenders by the Class member.

79.    The "Interest/Index Credits" are a key feature of the contract because, without significant interest credits, the contracts' long-term investment value is not protected and the contract returns cannot "beat the bank" or provide risk-free rates of return.

80.    The "Interest/Index Credits" are valuable to Class members because the credits translate into more cash for Class members:

- Increased credits increase the contracts' "Accumulation Value" that in turn leads to higher cash payouts to the retiree;

- Increased "Accumulation Value" results in higher annuity cash

payments to the retiree during the life of the contract;

- Increased "Accumulation Value" results in a higher "Cash Surrender Value" for those Class members wishing to terminate their contract; and,

- Increased cash flows during the contract term result in higher investment values and higher purchase date valuations.

**Contract Formation, Promises, Warranties and Recommendations**

81.    Defendants draft the non-negotiable, integrated, Secure Index contracts.

82.    During the application and contracting process, Class members execute mandatory disclosure forms (prepared by Defendants) that evidence Defendants' promises, recommendations, and/or warranties, and also the parties' mutual understanding of the contracts, including the following:

a.    Defendants represent and warrant that the Secure Index contracts are suitable for long-term retirement savings.

b.    Defendants promise, represent and/or warrant that the Secure Index contracts are suitable only for long-term investments and do not meet short term financial goals.

c.    Defendants promise, represent and/or warrant that the Secure Index contracts are subject to significant recapture and/or surrender charges for early withdrawals.

d.    Defendants promise, represent and/or warrant that the value of the Secure Index investments increases based on performance of the S&P 500 Index through the contracts' Strategies (without reference to Defendants' pre-established spreads and internal profit targets).

e.    Defendants set the price of the Secure Index contracts by the Index Strategies' caps, rates and spreads.  The price of the Secure Index contracts covers the cost of the contracts' guarantees, as well as Defendants' investment

1    management needed to support the investments' values.

2          f.      Defendants promise, represent and/or warrant that the value of

3    the Secure Index contracts will not fall below the minimum values set forth on the

4    contract data page.

5          g.      Defendants' appointed sales agents represent that they have not

6    made statements inconsistent with Defendants' uniform sales materials (that are

7    false and misleading).

8    83.    Upon contract delivery, ING/Voya reassures Plaintiff and members

9    of the Class that, although the FIA purchase was a "**big decision**," they had made

10   the right choice:  ING/Voya is their "**preferred financial services provider**" and

11   offers "**a fresh financial planning perspective . . . while forging successful**

12   **lifelong relationships**."  ING/Voya adds: "**Again, thank you for the trust and**

13   **confidence you have placed with us**."

14   **The Essential Terms of the Secure Index Contracts**

15   84.    The Secure Index contracts issued to Plaintiff and members of the

16   Class are substantially uniform.  The essential and uniform terms of the Secure

17   Index contracts are as follows:

18        *Section 6 – Strategies*

19   85.    ING/Voya is responsible for managing Class members' investments

20   (including both initial and additional premiums) and providing the financial

21   services that establish the contracts' Strategy Value parameters.  ING/Voya's

22   discretion in managing the investment must be based on the performance of the

23   S&P 500 Index (i.e., there is no provision for alternative bases, such as

24   Defendants' profitability).  This discretion limited to S&P 500 Index performance

25   is also inherently limited by:

26   •      the contracts' guaranteed Strategy Values (including the Minimum

27          Guaranteed Strategy Value);

28   •      statutory and regulatory requirements that ING/Voya spend at least

threshold levels of call options to either confer, hedge, or otherwise provide an equivalent or greater Strategy Value benefit to each Secure Index contract; and,

- an implied covenant of good faith and fair dealing.

86.    Otherwise, unlimited discretion in pricing the Secure Index contracts would render the Secure Index contracts' illusory.  Whether ING/Voya satisfies legal and contractual requirements, such as whether the contract is "based on" performance of the S&P 500 Index, is determined when ING/Voya sets the contract price (i.e., Strategy Value parameters, such as the Monthly Cap), upon payment of either initial or additional premiums under the contracts.

87.    For the "Index Strategies," ING/Voya's discretion purports to be based on the performance of the S&P 500 Index by virtue of the "Index Credits" provisions that are expressly "based on the performance of the applicable Index [S&P 500 Index] as measured over the contract year."

88.    Contract termination is not an enumerated contract Strategy.

*Section 5/Contract Data Page – Guaranteed Contract Values*

89.    The Secure Index contracts guarantee the value of the contracts' Strategies (e.g., Minimum Guaranteed Strategy Values), Accumulation Value, Cash Surrender Value and guaranteed values consistent with California law at all times, including California's non-forfeiture laws governing EIAs.

90.    Non-forfeiture laws require that ING/Voya provide "substantial participation" in the associated equity index and confer at least that benefit or more to the Secure Index contracts that are the subject of this litigation.

91.    Except for the Cash Surrender Value, the Secure Index contract does not require contract termination in order to realize the investments' guaranteed values, including the equity-indexed benefit.

*Section 8 – Statement of Account Values*

92.    Voya is obligated to issue an annual statement of values, and

1   implicitly, that statement of values must be accurate.

2   *Implied Covenants of Good Faith and Fair Dealing/Implied Insurance Laws*

3   93.    ING/Voya warrants, promises and recommends to each Secure Index

4   applicant and purchaser that the Secure Index contract is a suitable investment for

5   retirement savings, suitable for lifetime income, unsuitable for short term

6   investment, and that ING/Voya will price the contracts above minimum values and

7   provide investment management to support the contracts' values, including the

8   guaranteed minimum value of the Strategies (i.e., derivatives structure).   Upon

9   contract delivery, Defendants accept the trust and confidence of Plaintiff and the

10  Class in pricing the contracts properly, lawfully, and in good faith.

11  94.    Plaintiff and the Class also rely on Defendants to comply with all

12  applicable insurance law that are incorporated by reference and/or implied by law

13  into the contracts' terms.  ING/Voya is the party responsible under the contract for

14  fulfilling the contracts' purposes described above, and Plaintiff and the Class rely

15  on Defendants' expert knowledge of the contracts and the behavior and pricing of

16  the contracts' embedded derivatives to achieve these purposes.

17  **Defendants Undertake Fiduciary and Special Investment and Advisory Duties**

18  95.    Defendants reassure Class members upon contract delivery that

19  although the subject investment was a "***big decision***," ING/Voya is their

20  "***preferred financial services provider***" and that ***"[o]ur commitment to you does***

21  ***not end*** at the issuance of your enclosed contract.  Rather, ***our commitment to you***

22  ***begins***."  ING/Voya concludes the letter to each Class member: "***Again, thank you***

23  ***for the trust and confidence*** you have placed with us."  Ex. A (emphasis added).

24  96.    The contract delivery letter prepared by Defendants reflects

25  Defendants' acceptance of an ongoing, special, confidential and fiduciary

26  relationship to perform investment management and financial services duties

27  faithfully and in the best interests of Class members.

28  97.    Defendants' obligations to faithfully and dutifully manage Class

25

members' retirement investments and the related "Strategy Value" is evident in and includes the following:

a.    Defendants specifically target retirees and seniors for the sale of Secure Index contracts to "protect" retirement savings, and willingly accepted responsibility for the prudent management and stewardship of Class members' retirement savings;

b.    Defendants are duty-bound to adopt "seller beware" and "reasonable basis suitability" standards towards the design, marketing, administration, supervision, and investment management of the contracts, and Defendants know that the Class of retirees and seniors (and the sales agents also) cannot discern the investments' arcane exotic derivatives, pricing and valuation;

c.    Defendants accept Class members' trust and confidence and Defendants expressly commit to serve as Class members' financial services provider throughout the life of the investment;

d.    Because the Secure Index contract holders do not actually purchase the call options, ING/Voya acts as the investment manager, intermediary, agent, and/or trustee through which ING/Voya will transmit to Class members their contracts' participation in the upside of the S&P 500 Index;

e.    Defendants are duty-bound to execute the contracts and manage Class members' Secure Index investment in accordance with Defendants' representations to state insurance regulators (made in connection with the Secure Index product approval process);

f.    Defendants are duty-bound to execute the contracts and manage Class members' Secure Index investment in accordance with Defendants' representations to Class members that Defendants would perform "***the investment management needed to support the contracts' values***" including Strategy Values, guaranteed values and non-forfeiture values;

g.    Defendants establish and manage an options fund for the

benefit of Class members' Secure Index investment, including the Strategies sold to Plaintiff and the Class, and the Hedge (i.e., options and derivatives) purchased and/or created for the benefit of Class members, which are extraordinarily complex financial instruments and require expert management;

h.    Defendants use the options fund to purchase S&P 500 Index call options that capture S&P 500 Index performance, that both funds and Hedges the Strategy Value obligation to Class members for the benefit of Class members;

i.    Defendants are responsible for applying call option proceeds to Class members' Secure Index investments' contract values (including Strategy Values) from the sale and/or exercise of S&P 500 Index call options;

j.    Defendants locate and use existing Class members' existing retirement savings and cash values (such as existing annuity contracts, retirement accounts, and home equity) to recommend that those funds be used to purchase Secure Index contracts;

k.    Defendants have a pre-existing investment relationship with many Class members (such as Mr. Klevos) before the purchase of the Secure Index contract and/or before payment of "additional premium," and/or previous investments, and therefore undertake special and heightened duties relative to those retirement savings; and,

l.    Defendants are duty-bound to properly and accurately report to Class members the Secure Index investment values, including the current in-force Strategy Values and the contracts' fair market values as reported to the IRS.

**Defendants Charge Hidden Fees and Charges, Contrary to Representations**

98.    Defendants represent to Class members that the investments are suitable for long-term retirement savings and income for life. Mandatory disclosures of "important points" prepared by Defendants and provided to and acknowledged by Class members (and the appointed sales agents) state that: (*i*) ING/Voya will "set the price" that includes "the investment management

needed to support the contracts' values;" (*ii*) "[t]he minimum guaranteed contract value sets a minimum value that your contract will not fall below"; and (*iii*) ING/Voya reassures Class members that "[y]ou can use this annuity for retirement and to receive income for life."

99.    Those material disclosures also include false or misleading statements that "[t]he value of this annuity may also grow through **index credits** that depend on the S&P 500 index" and "**[t]here are not other fees or charges** on this annuity...."

100.    Defendants' material disclosures, acknowledged as a condition of contract issuance states that the disclosures do not differ from the sales materials, illustrations, or proposals from representations made by Defendants' appointed sales agent.

101.    Defendants knew that their statements that that there were no extra fees or charges was false.  Defendants' related material omissions included their actual crediting practices, hidden charges, conflicts of interest, and Defendants' losses in rising equity markets that were charged back against the options budget used to support the investment.

102.    The contract, and statutes incorporated by reference in the contract, govern the minimum price that ING/Voya establishes for the Strategies (i.e., Strategy Values) be equal to or greater than the amount of investment benefit from ING/Voya's purchase of call options.  For example, if ING/Voya spends $1,000 per contract on call options to capture price increases in the S&P 500 Index, then ING/Voya should confer a call options benefit, or Strategy Value, to Class members equal to or greater than $1,000 on the date of Strategy election. Otherwise, Class members are not receiving the full benefit of the purchased call option and that benefit is wrongfully retained by Defendants.

**Defendants' Unfair Practices**

103.    Defendants overreach in their discretion in setting the Strategy

28

pricing parameters in various ways. For example, before ING/Voya sets the Strategy price or Strategy Value, Defendants siphon funds that are available to fund the Strategy Value in order to first meet ING/Voya's internal, corporate-mandated profit targets and "spreads."

104. This self-dealing and disloyal act depletes the funds that could be spent on options for the benefit of Class members that would increase the value of the Secure Index investments. This practice also puts the interest of the Class at odds with Defendants' interests. Thus, ING/Voya's investment management practices substantially interfere and stymie the central value proposition of the Secure Index contracts that should increase in value "based on" *positive* performance in the S&P 500 Index.

105. In another example, after ING/Voya determines the reduced amount it will spend to purchase call options for the benefit of contract holders (thereby mismanaging the investment), ING/Voya sets the Strategy parameters in a manner that fails to properly match the value of call options purchased (i.e., the Hedge). For example, if ING/Voya spends $1,000 on call options, but sets the Strategy parameters at a lower value, such as $500, ING/Voya may successfully exercise call options after one year, but the Secure Index contracts do not realize improved values because the cheaper, embedded option did not generate any returns. If this were to occur, ING/Voya could pocket the difference in realized value when the option is successfully exercised; robbing Class members of income benefits.

106. Further, not only did Defendants fail to properly capture price increases in the S&P 500 Index, ING/Voya undertook massive **short positions** on equity index futures contracts whereby ING/Voya would suffer huge losses when equity index prices increased. The following table is adopted from Defendants' 1Q2014 Investor Presentation (dated May 2014):

| Preliminary Impact to Regulatory Capital and Earnings ($ million) | | | | | | |
|---|---|---|---|---|---|---|
| **Net Impact (increase / (decrease))** | **Equity Market (S&P 500)** | | | | | |
| | **-25%** | **-15%** | **-5%** | **5%** | **15%** | **25%** |
| Regulatory Capital | - | - | 50 | 150 | 200 | 250 |
| U.S. GAAP Earnings Before Income Taxes | 850 | 450 | 100 | (250) | (600) | (800) |

107.    As Voya's investor presentation shows, when the equity market prices increase, ING/Voya suffers massive losses when it gets caught shorting the market.  Either directly or indirectly, those losses cause or can cause ING/Voya's cost of capital to increase, adversely impacting the performance and valuation of the Secure Index contracts through reduced Strategy Value parameters and reduced income benefits to Class members.   Thus, ING/Voya's corporate investment policies conflict with and stymie the investment policies needed to maximize investment returns for Class members' retirement savings.

108.    ING/Voya did not explain this practice and obvious conflict of interest to insurance or securities regulators, leaving Class members (who were seeking to benefit from increases in the S&P 500 Index) effectively paying for Defendants' market losses when S&P 500 Index prices did increase.

**Defendants Lack "Seller Beware" and Lack "Reasonable Basis Suitability"**

109.    By creating, marketing and executing underlined unregistered Secure Index EIAs, Defendants should have undertaken a "***seller beware***" attitude towards its obligations under the Secure Index contracts, as well as its attendant investment management duties.[6]

---

[6]  Defendants sell underlined unregistered Secure Index contracts through various distribution channels, including members of the NASD/FINRA.  *See* Notice to Members No. 05-50 (Equity-Indexed Annuities – Member Responsibilities for Supervising Sales of Unregistered Equity-Indexed Annuities); Regulatory Notice 12-03 (Complex Products – Heightened Supervision of Complex Products); "Sellers Beware:  FINRA's New Suitability Rule and the Sale of Complex Investments." http://www.wilsonelser.com/writable/files/marasciullo_finra_suitability.pdf.

110.   A "*seller beware*" standard of conduct requires Defendants to properly train and supervise those persons responsible for the sale, administration and investment management of the Secure Index contracts.   This training and supervision should concern the investment values, how they are calculated, how the contracts' embedded derivatives perform in various markets, whether ING/Voya's investment policies are aligned with Class members' interests and objectives, and how the contracts' investment values may fall below the guaranteed values and be unsuitable for retirement savings.

111.   Defendants did not train or educate its sales force, administrative staff, key client-facing personnel, or investment managers concerning the existence and intricacies of the exotic derivatives embedded in the Secure Index contracts or their asymmetric exchange of risk-for-reward that vastly favored Defendants. Instead, for example, Defendants plied its appointed sales agents with upfront commissions of up to 8% to 10% of the initial premium and automatic trailing commissions for each year the contract is in force.

112.   Defendants also structured compensation packages for managers responsible for supervision of the Secure Index business with performance-based compensation tied to achieving Company earnings targets.  Achieving these targets can reward these managers for investment management practices that operate to rob Class members of retirement savings.

113.   In addition to its responsibilities for setting the investment price through establishment of rates and caps (including the price of the derivatives structure or options), ING/Voya warrants, promises, advises and recommends to each Secure Index applicant and purchaser that the Secure Index contract is a suitable investment for retirement savings, suitable for lifetime income, unsuitable for short term investment, and that ING/Voya will price the contracts above minimum values and provide investment management to support the contracts' values, including the guaranteed minimum value of the Strategies (i.e., derivatives

structure).  Upon contract delivery, Defendants accept the trust and confidence of Plaintiff and the Class in pricing the contracts properly, lawfully and in good faith.

114.  As the seller, ING/Voya must have a reasonable basis for these representations and recommendations, but here it does not.  Defendants executed and managed the derivatives and hedging structure embedded in the Secure Index contracts' "Strategies" provisions in a manner that was manifestly unfair to Class members.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

115.  Defendants have affirmatively and fraudulently concealed their unlawful practices and course of conduct from Plaintiff and the Class.  Plaintiff and other Class members did not know, and could not reasonably have known, of Defendants' unlawful practices and could not have reasonably discovered Defendants' violations of law explained herein.

116.  While under fiduciary and/or special relations with Class members to manage their investments, provide financial services, act in good faith and with fair dealing, and undertake special and heightened duties to retirees and seniors, Defendants actively and/or fraudulently concealed the matters described above at ¶¶ 95-97, including:

a.    Defendants do not execute the Secure Index contracts in the manner represented to state insurance regulators;

b.    As executed, there is a very high likelihood as of the purchase date that the Secure Index contracts will not protect retirement savings, will not outperform risk-free investments, and will not "beat the bank";

c.    The so-called "income benefits" of the Secure Index contracts are not based on the performance of the S&P 500 Index, but instead are based on Defendants first reimbursing their sales expenses and achieving Defendants' internal targeted spreads and profits, regardless of S&P 500 Index performance or related market conditions;

d.      Defendants do not employ "**seller beware**" or "**reasonable basis suitability**" standards or practices towards the design, marketing, sale, administration, execution and/or investment management of the unregistered Secure Index contracts;

e.      Defendants do not have a reasonable basis for recommending the Secure Index contract to retirees and seniors as an investment that is suitable for long-term retirement savings;

f.      Defendants do not adequately train their appointed sales agents and administrative staff regarding Defendants' investment management and execution of the Secure Index contract that causes the Secure Index contract to be unsuitable for retirement savings;

g.      The Secure Index contracts contain a hidden derivatives structure whereby Defendants engage in self-dealing to meet their own purposes, by misusing the options funds that were established for the benefit of Plaintiff and the Class; and

h.      ING/Voya does not guarantee the investment value of the contract while it remains in-force, and the fair market value of the investment as reported to the IRS is overstated.

117.    Defendants do not register the Secure Index contracts as securities, do not required appointed sales agents to have securities licenses, do not offer securities-related training to appointed agents, do not disclose the existence of the derivatives and hedging structure that drives the contracts' values, do not offer robust investment disclosures that are equivalent to a registered securities offering.

118.    Defendants' actual contract execution and investment management practices were actively and knowingly concealed and hidden in:

a.      Defendants' uniform marketing and Secure Index disclosure documents;

b.      State regulatory submissions;

c.   Secure Index contract language;

d.   Agent training materials, and

e.   Periodic account statements and related correspondence.

119.   To this day, Defendants continue to fraudulently conceal these practices from the Class and public alike. Defendants have refused to release or provide information about their practices in a way that Plaintiffs and/or the Class could have discovered their unlawful scheme and practices.  Although Defendants' initial decision to engage in these practices was made years ago, Defendants have repeatedly decided since then to continue concealing those unlawful practices.

120.   Defendants have uniformly ensured that their appointed sales agents are not informed concerning Defendants' unlawful scheme, described herein. Instead, Defendants motivate their appointed sales agents to keep negative information away from the Class by awarding renewal commissions for each year the subject Secure Index contracts remain in-force.

121.   As a result of the foregoing, Plaintiff and the Class could not reasonably discover the unlawful practices described herein and did not do so until just recently.  The vast majority of Class members still do not know that they have been financially harmed by Defendants' misconduct.

122.   Defendants' misconduct is continuing in nature.   There is a substantial nexus between the fraudulent conduct that has occurred within the statute of limitations and misconduct prior to that time.  The acts involve the same type of illicit practices and are recurring, continuous events.

123.   The statute of limitations applicable to any claims brought by Plaintiff and other Class members as a result of the conduct alleged herein has been tolled as a result of Defendants' fraudulent concealment.

## CLASS ACTION ALLEGATIONS

124.   Plaintiff brings this action on behalf of himself and other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b),

due to misconduct alleged herein.  Mr. Klevos seeks certification of the following Class:  "All persons or entities that, while a resident of California and within the applicable statute of limitations, purchased from ING USA Annuity and Life Insurance Company or Voya Insurance and Annuity Company a Secure Index equity indexed annuity investment with initial and/or additional premium."

125.    This case is properly brought as a class action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure for the following reasons.

126.    *Numerosity*.  The members of the Class are so numerous that separate joinder of each member of the Class is impracticable.  The Class consist of thousands of individuals and entities (such as insurance trusts).  It is estimated the hundreds of Class members paid "additional premiums" into their "flexible premium" contracts.  Class members (and their locations), the source(s) of funds used to purchase the contracts (e.g., replacement annuities), are readily identified through Defendants' customer records and the Class can be notified of the pendency of this action.

127.    *Commonality*.  There are numerous, substantial questions of law and fact common to the Class relating to Defendants' pricing practices that set the market value of the Strategies and investment values, as alleged herein.   The common questions include, but are not limited to:

i.      Whether Defendants embedded, in uniform Secure Index contracts, complex derivative structures that, as executed and managed by Defendants, caused Class members to lose investment value;

ii.      Whether Defendants abused their pricing discretion and investment management under the Secure Index contracts;

iii.      Whether Defendants falsely reported the Secure Index contract values in periodic statements mailed to Plaintiff and members of the Class;

iv.      Whether Plaintiff and members of the Class are entitled to damages,   specific   performance,   injunctive   relief,   restitution,   rescission,

disgorgement and/or other legal or equitable relief against Defendants;

v.      Whether Defendants targeted retirees and seniors for purposes of engaging in replacement and/or financing transactions (e.g., withdrawals from existing cash values, mortgage refinancing and/or reverse mortgages) as a means of generating proceeds to purchase Secure Index contracts;

vi.      Whether ING/Voya owed special and/or fiduciary obligations to the Class of retirees and seniors who purchased Secure Index contracts; and

vii.      Whether Secure Index contracts qualify as securities under California law.

128.   The amount of restitution and damages awardable to Plaintiff and each member of the Class can easily be determined from Defendants' customer database and related records.

129.   *Typicality*.  Plaintiff's claims are typical of the Class because (*i*) the subject Secure Index contracts and their provisions are uniform and employ "embedded derivatives," related "Index Strategies" and Strategy Values are uniform and priced similarly; (*ii*) the investment management, financial services and related discretion employed by ING/Voya under the contracts (whether or not the premium was "initial" or "additional") was uniform for both "initial premium" and "additional premium" through the use of standardized rate sheets and pricing methods used by ING/Voya; (*iii*) the subject Secure Index contracts and related pre-contract disclosure forms signed by Class members were uniform and prepared by Defendants, and the contract files are kept in the normal course of business by Defendants; and (*iv*) Defendants uniformly misreported contract values to Class members.

130.   *Adequacy of Representation*.  Plaintiff is an adequate representative of the Class, including the California Seniors Sub-Class.  Plaintiff purchased a Secure Index contract within the statute of limitations (and any tolling thereof) and, while a senior citizen and resident of California, suffered immediate losses on both

his "initial premium" and "additional premium" as a result of ING/Voya's faulty investment management and related execution of embedded derivative structures in the Secure Index contracts. Plaintiff is representative of those Class members with "flexible premium" contracts who paid "additional premium" and were thereby harmed. Further, Plaintiff is representative of those Class members who purchased Secure Index contracts with proceeds generated from "replacement" or similar "financing" transactions (such as mortgage refinancing or reverse mortgages) where the "cost" of those funds outweighed the benefits of purchasing a Secure Index contract.

131. Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and the Class. To this end, Plaintiff has retained competent counsel, experienced in complex civil litigation involving insurance products and financial forensics. Moreover, there is no hostility between Plaintiff and the unnamed Class members.

132. Plaintiff anticipates no difficulty in the management of this litigation as a class action. The law firms of Hutton Law Group and Tatro & Zamoyski, LLP have the resources, commitment and experience to prosecute the issues associated with this type of litigation. Plaintiff's counsel has previously represented purchasers of insurance products in a variety of class actions against insurance companies in federal and state courts throughout the country.

133. *Predominance.* There is a well-defined community of interest in the relevant questions of law and fact affecting Class members. The numerous, substantial questions of law and fact common to the Class related to ING/Voya's uniform deprivation of contractual benefits promised to Plaintiff and Class members predominates over any individual issues of law and fact, including but not limited to, the following:

       i. Whether ING/Voya uniformly omitted key risks and material information from Plaintiff and the Class;

ii.    Whether ING/Voya breached its investment management and financial services duties;

iii.    Whether ING/Voya issued false and misleading periodic statements to Plaintiff and the Class, including IRS Form 5468;

iv.    Whether ING/Voya committed financial elder abuse as defined in Cal. Welf. & Inst. Code §§ 15600, *et seq*.;

v.    Whether ING/Voya committed unfair, unlawful and/or fraudulent business practice, in violation of Cal. Bus. & Prof. Code §§ 17200 and 17500, in its marketing, promotion, solicitation, sales and issuance of deferred annuities to Plaintiff and Class members;

vi.    Whether ING/Voya breached its fiduciary and/special duties, and duties of good faith and fair dealing to Plaintiff and the Class;

vii.    Whether Plaintiff and the Class are entitled to damages; and

viii.    Whether Plaintiff and the Class are entitled to injunctive, declaratory, and/or other relief.

134.    The claims of Plaintiff and the other Class members have a common origin and share a common basis. Plaintiff and other Class members overpaid for their Secure Index contracts, which stems from Defendants' overreaching and pricing of a derivatives and hedging structure embedded in the Secure Index contracts. The claims originate from the same actionable conduct on the part of Defendants.

135.    *Superiority*. A class action is a superior procedure for the fair and efficient adjudication of this case as compared to other available methods because (*i*) prosecution of claims by Plaintiff or the Class members individually are impractical, as the costs of prosecution may exceed what Plaintiff or any one Class member has at stake; (*ii*) it is desirable to concentrate litigation of the claims herein within this forum; and (*iii*) the Class is manageable. Economies of time, effort and expense will be fostered and the action will cause an orderly and expeditious

1   administration of Class claims.

2   136.   The potential of nearly identical claims makes certification of the
3   Class convenient and desirable, particularly for those individuals who might
4   otherwise be left without a viable remedy.  Virtually all of the underlying issues in
5   this case are amenable to resolution through the class action procedure.  In the
6   alternative, a failure to certify the Class may result in an enormous number of
7   lawsuits involving the same core issues, which concern common issues and
8   standardized documents, with the potential for disparate results in cases that are
9   substantially the same.  Furthermore, such separate actions would result in the
10  expenditure of unnecessary time and expense, not only by the courts involved and
11  Plaintiff and other Class members, but Defendants as well.  In addition, Class
12  members would be discouraged from pursuing their claims individually with the
13  prospect of significant expenses, and individuals would therefore be without
14  sufficient strength to meaningfully prosecute Defendants.

15  137.   Class action treatment of this litigation is the only proper and
16  workable solution.  The class action would be manageable by focusing on the key
17  issues: (*i*) the terms of the uniform Secure Index contracts; (*ii*) the investment
18  management employed by ING/Voya; (*iii*) the reporting of contractual values to
19  Plaintiff and Class members; and, (*iv*) applying the legal remedies to the Class as a
20  whole.

21  138.   Class treatment will provide a means to notify Class members of
22  their rights and avoid typical burdens of actions, including the difficulty of finding
23  an attorney (and financial experts) to prosecute an important matter concerning
24  their retirement savings.

25  139.   When all the recognized factors are considered in determining
26  whether this matter should be certified as a class action, none is more compelling
27  than the obvious fact that to deny certification would effectively deny the
28  opportunity to be heard to many individuals and would at the same time potentially

create an unmanageable and protracted series of individual lawsuits, at best. At worst, it would leave thousands of individuals who need Class certification without a practical remedy of any sort. Thus, the denial of Class treatment in this case would not only burden the court system, but would also result in the denial of justice to citizens who cannot afford to pursue their individual claims since Defendants has their money and will retain their money unless justice prevails.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty - Against ING/Voya)

### (Aiding and Abetting a Breach of Fiduciary Duty – Against Voya Financial)

140.    Plaintiff hereby repeats and re-alleges all the preceding paragraphs, in particular ¶¶ 95-97, and incorporates the same as though fully set forth herein.

141.    Plaintiff and members of the Class were targeted by Defendants as a class of potential purchasers of Secure Index contracts because Plaintiff and members of the Class were actually or likely retired and/or seeking retirement planning and related financial solutions. By offering to hold and protect retirement savings, particularly of those who are defined by statute as "elderly," "retirees" or "senior citizens," Defendants undertook special obligations towards the Plaintiff and the Class inherent in its fiduciary and special relationships with Plaintiff and the Class.

142.    Defendants drafted Secure Index contracts whereby the essential terms of these uniform contracts were that ING/Voya agreed to be responsible for the establishment, adjustment, reporting and management of the investment parameters that directly and substantially affected the investments' ability to provide promised protection of Class members' retirement savings and income benefits.

143.    ING/Voya held a confidential position of trust with Plaintiff and the Class, by holding Class members' retirement savings and retaining the key and

exclusive investment decisions and investment discretion decisions that directly affected the ability of the investment to protect retirement savings and offer income benefits, as promised.

144.    Defendants created, designed and embedded a complex derivatives structure within the Secure Index contract that was kept hidden and actively concealed from Plaintiff and the Class, from Defendants' appointed agents, and from regulators.

145.    Defendants knew that Plaintiff and the Class were likely unaware of the derivatives structure embedded in the Secure Index contracts and therefore knew that it was impracticable for Plaintiff and members of the Class to properly make the important investment decisions surrounding the establishment, adjustment, reporting and management of the valuation parameters of the structured derivatives embedded in the contracts.

146.    Defendants knew that even if Plaintiff and members of the Class could discern the existence of the complex derivatives structure, that Plaintiff and the members of the Class had no reasonable or practical means of determining the value of the derivatives structures that were embedded in the contracts.    For example, it is unreasonable to expect Class members to discern the investments' fair valuations (through costly expert reviews) before expiration of the free-look period under the contracts.

147.    Defendants did not present the true mechanics and valuations of the complex derivatives structure to either insurance or securities regulators, nor did Defendants submit any related pricing parameters for regulatory review, thereby placing additional obligations upon Defendants to act in a trustworthy and responsible manner towards Plaintiff and members of the Class that ING/Voya had promised to protect.

148.    In the context of retaining and being vested with the most important and influential investments decisions under the Secure Index contracts, in

particular setting the pricing parameters of the embedded derivatives that would determine the success or failure of the investment, on behalf of Plaintiff and the Class, ING/Voya represented to Plaintiff and the Class in annuity contracts the following:

       i.     "You can use this annuity to save for retirement and to receive retirement income for life.  You should not purchase it to meet short-term financial goals."

       ii.     "The value of this annuity may also grow through index credits that depend on the performance of the S&P 500 index, a nationally recognized market index."

       iii.     "The minimum guaranteed value sets a minimum value that your contract will not fall below."

       iv.     "We set the price of an annuity contract, and the price reflects the compensation we pay for the sale of the annuity contracts.  The price also covers the cost of the contract guarantees, other costs such as design, manufacture and service of the contracts, as well as the investment management needed to support the contracts' values."

       v.     "We appreciate your purchase and would like to take this opportunity to assure you of our commitment to serving your financial needs."

       vi.     "That's why we want to thank you and welcome you to the growing number of contract owners who have chosen the ING family of companies as their preferred financial services provider."

       vii.     "Our commitment to you does not end at the issuance of your enclosed contract.  Rather, our commitment to you begins."

       viii.     "Again, thank you for the trust and confidence you have placed with us."

149.   ING/Voya knowingly undertook to act on behalf of Plaintiff and members of the Class with respect to the establishment and adjustment of the

pricing parameters of the derivatives structure embedded by Defendants in the Secure Index contracts.

150.   ING/Voya acted as agent, investment manager, and financial advisor on behalf of, and for the benefit of, Plaintiff and members of the Class in the selection of pricing parameters for the embedded derivatives that would directly influence the success or failure of the Secure Index contracts of Plaintiff and members of the Class.   Defendants also retained exclusive discretion to add, modify, or remove investment Strategies available to Plaintiff and the Class. ING/Voya was duty-bound to act with the utmost good faith towards Plaintiff and the Class with respect to setting the pricing parameters of the embedded derivative under Defendants' investment management duties.

151.   ING/Voya breached its fiduciary and/or special duties to Plaintiff and the Class (including breaches of the duties of loyalty and candor) in at least the following respects:

i.      By failing to disclose the existence of embedded derivatives under the Secure Index contracts;

ii.     By failing to explain the risks inherent in owning a Secure Index contract with a complex derivatives structure, that the investment is extremely difficult to value, and that the investment may behave unpredictably in various markets;

iii.    By failing to disclose that ING/Voya had a history of adjusting investment parameters in a manner that reduced the value of the Secure Index contract to compensate Defendants for "spreads," profit targets, risks, and investment losses that it was experiencing;

iv.     By failing to explain that the investments would perform poorly in a low interest rate environment and the reasons why;

v.      By failing to disclose that the embedded derivatives structure was not evaluated by any regulators as possible securities, and that the California

1 | Department of Insurance did not review the Secure Index contracts for product
2 | pricing and derivatives' behavior;

3 |         vi.    By failing to disclose Defendants' inherent conflicts of interest
4 | in retaining investment decisions under the Secure Index contracts that directly
5 | harmed Plaintiff and the Class to the sole and substantial benefit of Defendants;

6 |         vii.   By failing to protect the retirement savings of Plaintiff and
7 | members of the Class while providing income benefits, as promised; and

8 |         viii.  By charging expenses and/or reducing interest credits through
9 | undisclosed means, not provided for in the uniform Secure Index contracts.

10 |        152.   Voya Financial aided and abetted ING's breaches of fiduciary duty.
11 | Voya Financial owned, operated, and/or controlled ING/Voya throughout the
12 | relevant period of the factual allegations of this complaint.  Voya Financial acted
13 | for, on behalf of, aided, abetted, encouraged, and rendered substantial assistance to
14 | ING/Voya in furtherance of the wrongful acts alleged herein, including
15 | ING/Voya's breaches of fiduciary duties to Plaintiff and the Class.  Defendants
16 | acting for or on each other's behalf, aided and abetted, encouraged, and rendered
17 | substantial assistance to one another in order to accomplish the wrongful acts
18 | complained of herein.  In aiding and abetting and substantially assisting the
19 | commission of the acts complained of, Defendants acted with an awareness of their
20 | wrongdoing and realized that their conduct would substantially assist the
21 | accomplishment of the wrongful conduct and scheme alleged herein.  In
22 | performing these acts, Defendants ratified such acts, or both, and benefited
23 | financially from their scheme.

24 |        153.   As a result of the wrongful conduct of Defendants, Plaintiff and the
25 | Class have suffered and continue to suffer economic and non-economic losses, all
26 | in an amount to be determined according to proof at trial.

27 |        154.   In addition, the wrongful acts of Defendants were done maliciously,
28 | oppressively, and with the intent to mislead and defraud, and Plaintiff and the

Class are entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish defendants. Each of these violations was achieved because Defendants willingly, knowingly, and/or recklessly sought to gain their own financial advantage to the disadvantage of Plaintiff and the Class.

## **SECOND CAUSE OF ACTION**

### **(Financial Elder Abuse, California Welfare & Institutions Code Sections 15600, *et seq.* – Against Defendants)**

155.   Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

156.   ING/Voya's conduct constitutes financial abuse under Cal. Welf. & Inst. Code §§ 15657.5, *et seq.*, as defined in Cal. Welf. & Inst. Code § 15610.30.

157.   At all relevant times, Defendants took and/or assisted in the wrongful taking of retirement savings from Plaintiff and the California Class (who are all age 65 or older) for their own wrongful use, with intent to defraud, and/or with undue influence taking advantage of ING/Voya's unfair advantage under the contracts.

158.   ING/Voya held a confidential, special relationship, and position of trust or fiduciary relation with Plaintiff and the California Class, holding their retirement savings and acting as "trusted" advisors, and they each trusted and relied on ING/Voya for their retirement planning, insurance and financial affairs.

159.   ING/Voya's wrongful acts were done maliciously, oppressively, and with the intent to mislead or defraud, thereby warranting punitive and exemplary damages appropriate in an amount to be ascertained according to proof pursuant to Cal. Civ. Code §§ 3294, *et seq.*

160.   Under Cal. Welf. & Inst. Code §§ 15657.5, *et seq.*, ING/Voya is liable to the California Class for reasonable attorneys' fees and costs for investigating and litigating this claim. Under Cal. Civ. Code § 3345, ING/Voya is liable to the California Class for treble damages and penalties because:

(a) ING/Voya knew or should have known its conduct was directed to a senior citizen; (b) its conduct caused a senior citizen to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) Plaintiff and the members of the California Class are senior citizens who are more vulnerable than others to ING/Voya's conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) Plaintiff and the California Class actually suffered substantial physical, emotional and economic damages resulting from Defendant's conduct.

161.    Under Cal. Welf. & Inst. Code §§ 15657, *et seq*., ING/Voya is liable to Plaintiff and to members of the California Class for their pain and suffering.

## THIRD CAUSE OF ACTION

## (Violation of the California Insurance Code – Against Defendants)

162.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

163.    The Secure Index contracts are subject to state statutes and regulations, and include insurance statutes that form a part of every contract of insurance.  For example, under Cal. Ins. Code § 101, annuities are classified as life insurance.  Under Cal. Ins. Code § 380, a Secure Index contract is a "policy" and "contract of insurance."

164.    Throughout contract formation, in violation of Cal. Ins. Code § 330, Defendants neglected to communicate known material facts to Plaintiff and the Class.  Defendants also failed to communicate to Plaintiff and the Class, in good faith, all facts within Defendants' knowledge that are material to the Secure Index contract and which Plaintiff and the Class had no means of ascertaining, in violation of Cal. Ins. Code § 332.

165.    Defendants failed to disclose and actively concealed, in violation of Cal. Ins. Code §§ 330 and 332, common law, and the California Securities Act, the following material facts:

a.     Defendants do not execute the Secure Index contracts in the manner represented to state insurance regulators;

b.     Use of existing cash values from other retirement assets (such as an annuity, home equity or retirement account), including the "replacement" of cash values or "financing" of cash values, to purchase Secure Index contracts would likely destroy the value of those retirement assets;

c.     As executed, there is a very high likelihood as of the purchase date that the Secure Index contracts will not protect retirement savings, will not outperform risk-free investments, and/or will not "beat the bank;"

d.     The so-called "income benefits" of the Secure Index contracts are not based on performance of the S&P 500 Index, but instead are based on Defendants first achieving their targeted spreads and profits targets, regardless of S&P 500 Index performance or related market conditions;

e.     Defendants do not employ "***seller beware***" or "***reasonable basis suitability***" standards or practices towards the design, marketing, sale, administration, execution and/or investment management of the unregistered Secure Index contracts;

f.     Defendants do not have a reasonable basis for recommending the Secure Index contract to retirees and seniors as an investment that is suitable for long-term retirement savings;

g.     Defendants do not adequately train their appointed sales agents and administrative staff regarding Defendants' investment management and execution of the Secure Index contract that causes the Secure Index contract to be unsuitable for retirement savings;

h.     The Secure Index contracts contain a hidden derivatives structure whereby Defendants engage in self-dealing to meet their own purposes, by misusing the options funds that were established for the benefit of Plaintiff and the Class; and

i.     ING/Voya does not guarantee the investment value of the contract while it remains in-force.

166.   During and at conclusion of contract formation, in violation of Cal. Ins. Code § 785, Defendants failed to treat Plaintiff and members of the California Seniors Sub-Class with honesty, good faith and fair dealing in at least the following respects:

a.     Defendants failed to disclose the material facts described above, in ¶ 165;

b.     Defendants failed to fulfill their obligations of good faith and fair dealing, and fiduciary and/or special duties, as described above, in ¶¶ 95-97.

c.     Defendants did not execute the Secure Index contracts and did not manage Class members' investments for the benefit of the Class members; rather, Defendants executed the contracts in a self-dealing and disloyal manner to benefit Defendants and their shareholders, at the expense of the Class; and,

d.     Defendants executed the Secure Index contracts to minimize the amount of contractual benefits associated with the performance of the S&P 500 Index.

167.   During and at conclusion of contract formation, in violation of Cal. Ins. Code § 790.02, Defendants engaged in the following unfair practices in the business of insurance, including:

a.     Defendants did not execute the Secure Index contracts in the manner represented to the California Department of Insurance;

b.     Defendants did not require the Strategy Value to be worth at least 100 bps of equivalent options value at the beginning of each contract year for each Class member, as was represented to the CDI;

c.     Defendants did not credit Class members' Accumulation Values with options sales and/or exercise proceeds, as was represented to the CDI;

d.     Defendants do not support or maintain the Secure Index

contracts' values at levels at or above the contracts' minimum guaranteed values; and

e.      Defendants' overreaching and pricing practices for the Strategy values caused some Class members to terminate their Secure Index contracts early, suffering punishing surrender charges paid to Defendants.

## FOURTH CAUSE OF ACTION

### (Unlawful, Deceptive, and Unfair Business Practices – Against Defendants)

168.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

169.    In forming and executing Secure Index investments with Plaintiff and the Class as described above, Defendants engaged in unlawful deceptive and unfair business acts and deceptive and misleading practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*  Further, California Bus. & Prof. Code § 17500, *et seq*. prohibits unfair, deceptive and misleading advertising. The alleged unfair competition practices, including those practices described above at ¶¶ 98-114 were likely to deceive a reasonable investor, retiree or senior.

170.    Defendant's acts of unfair competition and unlawful practices include the statutory violations described herein including, *inter alia*, California Welfare & Institutions Code §§ 15600, *et seq.*, Cal. Civ. Code § 1710, and Cal. Ins. Code §§ 330, 332, 785 and 790, as explained above.

171.    Defendants' unfair business practices that resulted in harm to the Class, includes those practices described above at ¶¶ 98-114, and specifically the following:

i.      By not executing the contracts and managing the Secure Index investment in the manner that was represented to the California Department of Insurance;

ii.      By engaging in unfaithful, disloyal and self-dealing investment management practices that benefitted Defendants and their shareholders, to the

detriment of Plaintiff and the Class;

        iii.    By basing the Strategy Value rates and parameters on Defendants' financial performance, losses, expenses, shorting futures on equity indexes, competitive position and risk profile, instead of basing Strategy rates and parameters on performance of the S&P 500 Index;

        iv.    Defendants do not adequately train their appointed sales agents and customer-facing personnel regarding Defendants' investment management and execution of the Secure Index contract that causes the Secure Index contract to be unsuitable for retirement savings;

        v.    By failing to employ "seller beware" and "reasonable basis suitability" in connection with selling, administering and managing the unregistered Secure Index EIAs;

        vi.    By causing Secure Index contracts to be purchased with funds taken from "replacement" or transfers of existing annuity savings, or through "financing" of premium payments (such as mortgage refinancing and/or reverse mortgages) where the cost of replacement and/or financing exceeded the expected financial benefits of the Secure Index contract; and

        vii.    By charging undisclosed fees, costs and other charges beyond those allowed by contract and/or statute.

    172.    As a result of the conduct described above, Defendant has and will be unjustly enriched at the expense of Plaintiff and the Class. Specifically, Defendant has been unjustly enriched by receiving substantial monies and profits from the sale of their Secure Index contracts that were promoted and sold through falsely warranting, promising and/or recommending, either directly or by implication, the true risks of such products for purchase by senior citizens. Further, both Plaintiff and the Class have been deprived of money or property as a result of Defendant's wrongful conduct and unlawful acts and practices and, therefore, have sustained injury in fact.

173.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Class seek a court order requiring Defendant to immediately cease such acts of unfair competition and enjoining them from continuing to deceptively advertise or conduct business via the unlawful or unfair business acts and practices and deceptive and misleading advertising complained of herein.  Plaintiff and the Class also request an order requiring Defendant to engage in a corrective advertising campaign.

174.    Plaintiff and the Class additionally request an order requiring Defendant to disgorge its ill-gotten gains as described above and awarding Plaintiff and the Class full restitution of all monies and property wrongfully acquired by Defendant by means of such unlawful business practices, acts of unfair competition and false advertising, plus interest and attorney fees, so as to restore an and all monies Plaintiff and the Class which were acquired and obtained by means of such deceptive, unfair or unlawful business practices.  Under Cal. Welf. & Inst. Code §§ 15657, *et seq.*, ING/Voya is liable to Plaintiff and to members of the California Class for their pain and suffering.

## **PRAYER**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment against defendants as follows:

A.    For an Order certifying Class and/or Sub-Class to encompass claims related to "additional premiums," "replacement" or "financing" of premiums, and appointing Plaintiff as Class representative, and appointing Plaintiff's counsel as Class counsel;

B.    For an order requiring disgorgement and return of defendants' ill-gotten gains to Plaintiff and the Class, and to pay damages and restitution to Plaintiff and the Class for conduct declared by this Court to be in breach of the Secure Index contracts;

C.    For distribution of any moneys recovered, via fluid recovery or *cy pres* recovery where necessary to prevent defendants from retaining any of the

1    profits or benefits of their wrongful conduct, on behalf of Plaintiff or the Class;

2        D.      For imposition of a constructive trust;

3        E.      For specific performance;

4        F.      For compensatory, special and/or general damages according to

5    proof;

6        G.      For punitive and exemplary damages pursuant to Cal. Civ. Code

7    § 3294 due to clear and convincing evidence of Defendants' oppression, fraud or

8    malice;

9        H.      For reasonable attorneys' fees and costs of investigation and

10   litigation under Cal. Welf. & Inst. Code § 15657.5(a) and all other available

11   remedies under Cal. Welf. & Inst. Code § 15657.5(b);

12       I.      For costs of suit, pre-judgment and post-judgment interest; and

13       J.      For such other and further relief as the Court may deem appropriate.

14                              **DEMAND FOR JURY**

15       Plaintiff demands a jury trial of all claims triable by a jury.

16   DATED: March 9, 2017

17                                     */s/ Andrew W. Hutton*
                                       ANDREW W. HUTTON
18                                     **HUTTON LAW GROUP**
                                       12671 High Bluff Drive, Suite 130
19                                     San Diego, CA  92130
                                       Telephone:  (858) 793-3500
20                                     Facsimile:   (858) 793-3501
                                         drew@law-hutton.com
21

22                                     */s/ Timothy J. Tatro*
                                       TIMOTHY J. TATRO
23                                     **TATRO & ZAMOYSKI, LLP**
                                       12760 High Bluff Drive, Suite 210
24                                     San Diego, CA 92130
                                       Telephone:  (858) 244-5032
25                                     Facsimile:   (858) 847-0032
                                         tim@tatrozamoyski.com
26

27                                     Attorneys for Plaintiff

28

                                   52

# Exhibit A

Larry D Klevos

Your Annuity Contract



FINANCIAL



July 20, 2016

Larry D Klevos

Contract Number: ▮▮▮▮▮▮▮

Annuitant Name: Larry D Klevos

Dear Valued Client:

We know that choosing to purchase an annuity product in today's ever-changing marketplace is a big decision. That's why we want to thank you and welcome you to the growing number of contract owners who have chosen the Voya Financial™ family of companies as their preferred financial services provider.

Voya Insurance and Annuity Company, the issuer of your annuity contract, is a member of the Voya™ family of companies, a first-class global organization that strives to offer a fresh financial planning perspective to its customers while forging successful lifelong relationships.

Our commitment to you does not end at the issuance of your enclosed contract. Rather, our commitment to you begins.

So, if there is anything you need, whether you want answers to specific questions or general information about your contract, please contact us at the number shown below and a representative will be happy to assist you Monday through Thursday 8:30 a.m. to 6:30 p.m. Eastern Time and Friday 8:30 a.m. to 5:30 p.m. Eastern Time.

Again, thank you for the trust and confidence you have placed with us.

Sincerely,

Michael Smith
President

Customer Service Center
P.O. Box 617
Des Moines, IA 50303-0617
800-369-5303

## Contract Highlights and Delivery Statement - Voya Secure Index Five

To ensure accuracy, we ask that you review and verify the following information regarding the contract you received.

Contract Information:

| | |
|---|---|
| Contract Number: ███████ | Contract Date: January 20, 2011 |
| Product: Voya Secure Index Five | Type: IRA - Rollover |
| Annuitant/Sex: Larry D Klevos/Male | Date of Birth: ███████ |
| Owner/Sex: Larry D Klevos/Male | Date of Birth: ███████ |
| Beneficiary(s): ████████ | 100.00%          Primary |
| Initial Premium: $84,980.00 | Starting S&P 500 Index Number: 1281.92 |

### Allocation of Initial Premium*

| Strategy | Allocation Percentage | Premium Amount |
|---|---|---|
| Monthly Cap Index | 100.00% | $84,980.00 |

*Please refer to your Contract Data Page for rate information.

If you have any questions, please contact our Annuity Service Consultants at (800) 369-5303.

## CONTRACT ACKNOWLEDGEMENT AND DELIVERY STATEMENT

PLEASE SIGN BELOW AND RETURN THIS STATEMENT IN THE ENCLOSED PRE-ADDRESSED ENVELOPE. IF YOU DO NOT RESPOND WITHIN 30 DAYS, THE INFORMATION WILL BE DEEMED CORRECT. ANY FINANCIAL TRANSACTIONS YOU REQUEST MUST BE SIGNATURE GUARANTEED OR NOTARIZED UNTIL THIS SIGNED FORM IS RECEIVED. THE DELIVERY DATE COMMENCES THE APPLICABLE EXAMINATION PERIOD AS DETAILED ON THE COVER PAGE OF THE CONTRACT.

I/WE ACKNOWLEDGE RECEIPT OF THE CONTRACT.

Signature of Owner(s)*_____  Date _____

Signature of Joint Owner(s) _____  Date _____

* If Contract Owner is a Custodian, an authorized signature may be required.

Thank you for choosing Voya Insurance and Annuity Company. If you have any questions, please call the Voya Service  at 800-369-5303. You may return this form by regular mail to the Voya Service , P.O. Box 1337, Des Moines, IA 50306-1337 or by fax to 515-698-2001.

Contract: ███████

## IMPORTANT
## NOTICE OF THIRTY DAY RIGHT TO EXAMINE CONTRACT

YOU HAVE PURCHASED AN ANNUITY CONTRACT.  CAREFULLY REVIEW IT FOR LIMITATIONS.

THIS CONTRACT MAY BE RETURNED WITHIN 30 DAYS FROM THE DATE YOU RECEIVED IT FOR A FULL REFUND BY RETURNING THE CONTRACT TO THE INSURANCE COMPANY OR AGENT WHO SOLD YOU THIS CONTRACT. A RETURN OF THE CONTRACT AFTER 30 DAYS MAY RESULT IN A SUBSTANTIAL PENALTY, KNOWN AS A SURRENDER CHARGE.

FOR MORE INFORMATION ABOUT THE SURRENDER CHARGES PLEASE REFER TO THE CONTRACT.

Secretary: _Joy M. Benner_

President: _[signature]_

Voya Insurance and Annuity Company
Customer Contact Center
909 Locust St
Des Moines, IA 50309-2803
1-(800) 369-5303

Order #146131 **CA** 11/04/2008

**Voya Insurance and Annuity Company**
Des Moines, Iowa

**Customer Service Center**
P.O. Box 617
909 Locust Street
Des Moines, Iowa 50303-0617
1-800-369-3690

In this Contract, "you" or "your" refers to the Owner and "we", "our", or "us" refers to Voya Insurance and Annuity Company, a stock company.

If this Contract is in force on the Maturity Date, we will pay the Proceeds according to the terms on this and the following pages. The Proceeds will provide a monthly income, or other settlement, in accordance with the Payment Plan selected.

**READ YOUR CONTRACT CAREFULLY.** This is a legal Contract between you and us

### 20 DAY RIGHT TO EXAMINE AND RETURN THIS CONTRACT

**Right to cancel. If you are not satisfied, you may cancel your Contract by returning it within 20 days after the date you receive it. Mail or deliver it to us at the address shown above or to your agent. (If you return the Contract by mail, it will be deemed returned on being postmarked, properly addressed, and postage prepaid.) This Contract will then be void from its start. Any portion of the Premium paid and not previously withdrawn will be refunded.**

This Contract is signed by us as of its Contract Date.

Secretary                                      President

**This Contract contains equity indexed Strategies. The equity indexed Strategies are described on pages 10 through 14.**

**Any Surrender(s) during the first five Contract years may be subject to Surrender Charges as shown in the Table of Surrender Charges on page 4.**

### FLEXIBLE PREMIUM DEFERRED ANNUITY CONTRACT

**Annuity benefit payable at Maturity Date.**
**Death benefit payable in event of the**
**Owner's death prior to Maturity Date.**

CASH SURRENDER VALUES MAY INCREASE BASED ON THE INDEX CALCULATION OF THE STRATEGY(IES) YOU HAVE SELECTED. THE INITIAL INTEREST RATE FOR THE FIXED RATE STRATEGY IS GUARANTEED FOR ONE YEAR ONLY. WHILE CONTRACT VALUES MAY BE AFFECTED BY AN EXTERNAL INDEX, THE CONTRACT DOES NOT DIRECTLY PARTICIPATE IN ANY STOCK OR EQUITY INVESTMENTS.

**NONPARTICIPATING**

IU-IA-3033(CA)

**TABLE OF CONTENTS**

1. **GENERAL DEFINITIONS**

2. **PAYMENT OF PROCEEDS**
   2.1 Death of Annuitant (Who is not an Owner)
   2.2 Surrender of Contract
   2.3 Death of Contract Owner
   2.4 Exemption of Proceeds

3. **PREMIUM**
   3.1 Electing Strategies

4. **OWNERSHIP, ASSIGNMENT, AND BENEFICIARY PROVISIONS**
   4.1 Ownership
   4.2 Assigning Your Contract
   4.3 Beneficiary
   4.4 Simultaneous Death of Beneficiary and Owner

5. **GUARANTEED CONTRACT VALUES**
   5.1 Accumulation Value
   5.2 Cash Surrender Value
   5.3 Surrender Charges
   5.4 Minimum Guaranteed Contract Value
   5.5 Payment Deferral
   5.6 Basis of Computation

6. **STRATEGIES**
   6.1 Fixed Rate Strategy
   6.2 Point-to-Point Participation Index Strategy
   6.3 Point-to-Point Cap Index Strategy
   6.4 Monthly Average Index Strategy
   6.5 Monthly Cap Index Strategy

7. **PAYMENT PLANS**
   7.1 Plan A. Interest
   7.2 Plan B. Fixed Period
   7.3 Plan C. Life Income

8. **GENERAL TERMS**
   8.1 The Contract
   8.2 Incontestability
   8.3 Valid Release for Payment
   8.4 Option to Change Maturity Date
   8.5 Annual Statement of Values
   8.6 Mistake of Age or Sex

## CONTRACT DATA PAGE

| | |
|---|---|
| ANNUITANT: | Larry D Klevos |
| SEX: | Male |
| AGE: | 66 |
| OWNER: | Larry D Klevos |
| CONTRACT NUMBER: | ▮▮▮▮▮ |
| CONTRACT DATE: | January 20, 2011 |
| MATURITY DATE: | January 20, 2040 |
| INITIAL PREMIUM PAID: | $84,980.00 |
| STATE PREMIUM TAX PAID: | $0.00 |
| INITIAL PREMIUM LESS PREMIUM TAX: | $84,980.00 |

### INITIAL CREDITING STRATEGY ELECTION

This table reflects the initial election of the Strategies for your Initial Premium. The initial rates, caps, and spread shown apply to your Initial Premium and are guaranteed for the first Contract Year and may change thereafter as described in the Strategies section of this Contract. The rates in the table are used to determine the Accumulation Value of each Strategy. They are not used to determine the Minimum Guaranteed Contract Value or the Minimum Guaranteed Strategy Values.

| | Fixed Rate Strategy | Point-to-Point Participation Index Strategy | Point-to-Point Cap Index Strategy | Monthly Average Index Strategy | Monthly Cap Index Strategy |
|---|---|---|---|---|---|
| Percentage of Initial Premium | 0% | 0% | 0% | 0% | 100.00% |
| Amount of Initial Premium | $0.00 | $0.00 | $0.00 | $0.00 | $84,980.00 |
| Minimum Guaranteed Interest Rate | 1.5% | | | | |
| Initial Interest Rate | 0% | | | | |
| Initial Participation Rate | | 0% | | 0% | |
| Initial Index Cap | | | 0% | | |
| Initial Index Spread | | | | 0% | |
| Initial Monthly Cap | | | | | 1.60% |

The Participation Rate, applicable to the Point-to-Point Participation Index Strategy and the Monthly Average Index Strategy, will never be less than 0% and will never exceed 150%. The Index Cap, applicable to the Point-to-Point Cap Index Strategy, will never be less than 0% and will never exceed 100%. The Index Spread, applicable to the Monthly Average Index Strategy, will never be less than 0% and will never exceed 25%. The Monthly Cap, applicable to the Monthly Cap Index Strategy, will never be less than 0% and will never exceed 25%.

## MINIMUM GUARANTEED CONTRACT VALUE

|  | Fixed Rate Strategy | Index Strategies |
|---|---|---|
| Initial Minimum Guaranteed Strategy Value Rate: | 1.50% | 1.50% |

The **Minimum Guaranteed Contract Value** equals the sum of the Minimum Guaranteed Strategy Value of each Strategy less any Surrender Charge.

The **Minimum Guaranteed Strategy Value** of each Strategy equals:
 (a)  100% of the portion of the Initial Premium elected to the Strategy, adjusted for
 (b)  Any Premiums, Re-elections and Surrenders from Accumulation Value in that Strategy; plus
 (c)  Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate.

The initial Minimum Guaranteed Strategy Value Rates shown above are set on the Contract Date and will not change for the first nine Contract Years.  On the ninth Contract Anniversary and on each Contract Anniversary thereafter, the **Minimum Guaranteed Strategy Value Rates** for all Strategies will be set equal to the average of the five-year Constant Maturity Treasury Rate for each day that it is reported by the Federal Reserve during the month of October in the calendar year preceding the calendar year of the Contract Anniversary, less 1.25% for the Fixed Rate Strategy and less 2.25% for the Index Strategies.  The Minimum Guaranteed Strategy Value Rate for both the Fixed Rate Strategy and the Index Strategies will be rounded to the nearest 0.05% and will not be greater than 3.0% or less than 1.5%.

**Re-elections and Surrender Adjustments**

A Re-election of Accumulation Value will result in a pro-rata Re-election of the Minimum Guaranteed Strategy Value in the same proportion as the Accumulation Value being re-elected bears to the total Accumulation Value in the Strategy from which the Re-election is made.

Surrender of Accumulation Value from any Strategy will result in a dollar for dollar reduction of the Minimum Guaranteed Strategy Value of that Strategy equal to the Accumulation Value Surrendered.

## TABLE OF SURRENDER CHARGES

| Contract Year | 1 | 2 | 3 | 4 | 5 | 6 and later |
|---|---|---|---|---|---|---|
| Percentage | 8% | 7.5% | 6.5% | 5.5% | 4.5% | 0% |

IU-IA-3033(CA)                                                4

## 1. GENERAL DEFINITIONS

**Accumulation Value** is defined in Section 5.1.

**Additional Premiums** means any payments, other than the Initial Premium, made by you to us under this Contract.

**Annuitant** means the person, designated by you, on whose life the annuity payments for this Contract are based. You are the Annuitant if no Annuitant is named. The Annuitant may not be changed during the Annuitant's lifetime.

**Beneficiary(ies)** means the person(s) or entity(ies) you have chosen to receive the Contract's Proceeds if the Owner, as shown in our records, dies prior to the Maturity Date. If there are joint Owners, the surviving Owner will be deemed to be the Beneficiary. There may be different classes of Beneficiaries, such as primary and contingent. These classes set the order of payment. There may be more than one Beneficiary in a class. You may name any Beneficiary to be an irrevocable Beneficiary.

**Cash Surrender Value** means the value available upon full Surrender of the Contract.

**Contingent Annuitant** means the person you have chosen to become the Annuitant if the named Annuitant dies prior to the Maturity Date.

**Contract Date** means the date on which the Contract is effective. **Contract Years**, and **Contract Anniversaries** are measured from the Contract Date. The Contract Date is shown on the Contract Data Page.

**Effective Date** as it appears in any attachments, riders or endorsements to the Contract means the Contract Date.

**Election Anniversary** means the same date as the applicable Election Date each year.

**Election Date** means the date on which the Re-election or Premium, as applicable, is elected for any specific Strategy(ies).

**Election Year** means the period beginning on an Election Anniversary and ending on the day before the following Election Anniversary.

**Fixed Rate Strategy** means the Strategy described in Section 6.1 of this Contract.

**Index** means the Standard & Poor's 500* Composite Stock Price Index ("S&P 500 Index"). It is used to determine the Index Credit. If the S&P 500 Index is discontinued or if the calculation of the Index is substantially changed, we will substitute an alternative Index, as approved by the Insurance Department of the state in which this Contract is issued, and notify you in writing.

**Index Cap** is defined in Section 6.3.

**Index Credit** is defined in Section 6.2, Section 6.3, Section 6.4, and Section 6.5 as applicable to the respective Strategies discussed in those Sections.

**Index Number** means the published value of the Index. It excludes any dividends that may be paid by the firms that comprise the Index. Each Premium/Redistribution will be assigned an Index Number equal to the value of the Index as of the close of business on the day before the Election Date. The Index Number for the start of each

---

* "Standard & Poor's 500" is a trademark of The McGraw-Hill Companies, Inc. and has been licensed for use by Voya Insurance and Annuity Company. The product is not sponsored, endorsed, sold or promoted by Standard & Poor's and Standard & Poor's makes no representation regarding the advisability of purchasing the product.

Indexing Period after the first will be the Index Number as of the close of business on the day before the Election Anniversary. If the Index Number is not published on any day for which a calculation is made, the first preceding published Index Number will be used.

**Index Spread** is defined in Section 6.4.

**Index Strategy(ies)** means any Strategy which makes use of the Index described above, or an approved alternative, in the determination of its values.

**Indexing Period** is defined in Section 6.2, Section 6.3, Section 6.4, and Section 6.5 as applicable to the respective Strategies discussed in those Sections.

**Initial Premium** is the payment amount required to put this Contract in effect.

**Maturity Date** means the date the Owner begins receiving the proceeds under a Payment Plan. As long as this Contract is still in force on the Maturity Date, the amount of the Proceeds is used to determine the amount paid under the Payment Plan chosen. The Maturity Date may not be prior to the first Contract Anniversary nor later than the Contract Anniversary following the Owner's (oldest joint Owner if applicable) attainment of age 95 (the Annuitant's attainment of age 95 if any Owner is a non-natural Owner).

**Minimum Guaranteed Contract Value** is defined on the Contract Data Page.

**Minimum Guaranteed Strategy Value** is defined on the Contract Data Page.

**Minimum Guaranteed Strategy Value Rates** are defined on the Contract Data Page.

**Monthly Anniversary** is defined in Section 6.4 and Section 6.5.

**Monthly Cap** is defined in Section 6.5.

**Nonparticipating** means this Contract will not pay dividends. It will not participate in any of our surplus or earnings.

**Owner** means you, the person (persons if there is a joint Owner, or entity(ies) if the Owner is not an individual) who owns the Contract, as shown in our records. If any Owner is not an individual, the death of the Annuitant will be treated as the death of an Owner.

**Participation Rate** is defined in Section 6.2 and Section 6.4.

**Payment Plan** means one of the methods of payment for receiving the Proceeds.

**Premiums(s)** means collectively the Initial Premium and any Additional Premiums.

**Premium Tax** means any tax or fee imposed or levied by any state government, or political subdivision thereof, on the Premium(s), depending upon the requirements of the state in which this Contract is issued.

**Proceeds** mean the greater of the Minimum Guaranteed Contract Value or the Accumulation Value.

**Re-election(s)** means changing the Strategy applicable to a portion or all of the Accumulation Value.

**Strategy(ies)** means any of the interest crediting Strategies available under the Contract, as defined in Section 6, now or as amended.

**Surrender** means a partial or full withdrawal of Accumulation Value from the Contract.

**Surrender Charge** means a charge payable at the time of Surrender on the terms set forth in Section 5.2 and Section 5.3.

2. **PAYMENT OF PROCEEDS** - On the Maturity Date, we will pay the Proceeds of the Contract as directed by you if the Annuitant is living, unless Section 2.3 applies. You must elect, at least 30 days prior to the Maturity Date, to have the Proceeds paid under one of the Payment Plans set out in Section 7. If no election is made, Proceeds will be paid automatically as a monthly income for a minimum of 120 months and as long thereafter as the Annuitant lives. If you have not directed to whom the Proceeds will be paid, the Proceeds will be paid to you.

2.1 **Death of Annuitant** (Who is not an Owner)

(a) If the Annuitant who is not an Owner dies prior to the Maturity Date, the Contingent Annuitant, if any, becomes the Annuitant. You will be the Contingent Annuitant unless another Contingent Annuitant is named. If the Annuitant dies and no Contingent Annuitant has been named, we will allow you 60 days from the Annuitant's death to designate someone other than yourself as the Annuitant. If there are joint Owners, we will treat the youngest Owner as the Contingent Annuitant unless you direct otherwise. However, if any Owner is not an individual and the Annuitant dies prior to the Maturity Date, we will treat the death of the Annuitant as the death of an Owner as described in Section 2.3.

(b) If the Annuitant who is not an Owner dies on or after the Maturity Date but before all Proceeds payable under the Contract have been distributed, we will continue payments under the Payment Plan in effect at the time of the Annuitant's death.

Before making any payments, we may require proof of the Annuitant's death in a form acceptable to us.

2.2 **Surrender of Contract** - Any time prior to the Maturity Date, you may ask in a form acceptable to us to receive all or a portion of the Contract's Cash Surrender Value as defined in Section 5.2. Upon full Surrender, the Contract will cease to have any further value. We may require the Contract to be returned to us before the Cash Surrender Value is paid.

The minimum amount that may be Surrendered at any one time is the lesser of $1,000 or the maximum partial Surrender not subject to Surrender Charges as stated in Section 5.2. A partial Surrender may not reduce the Cash Surrender Value below $1,000. Partial Surrenders will be taken from the Strategies on a pro rata basis. Surrenders do not participate in any Index Credits in the Index Strategies for the Election Year in which they are taken.

2.3 **Death of Contract Owner**

(a) If any Owner of the Contract dies before the Maturity Date, the following applies:

(1) If the Beneficiary is the deceased Owner's spouse, the Contract may continue with the surviving spouse as the new Owner and, if the deceased Owner was also the Annuitant, the deceased Owner's spouse will become the Annuitant. However, if this Contract has been continued as provided in this provision, upon death of the new Owner (the surviving spouse), the entire Proceeds must be distributed as stated in (2) below. If the deceased Owner's spouse does not choose to continue the Contract, the Proceeds will be distributed as stated in (2) below.

(2) If the Beneficiary is someone other than the deceased Owner's spouse, the entire Proceeds must be distributed to the Beneficiary: (a) within 5 years of the deceased Owner's death; or (b) over the life of the Beneficiary or over a period not extending beyond the life expectancy of the Beneficiary, with payments beginning within one year of the deceased Owner's death. If this Beneficiary dies while receiving payments but before the entire Proceeds have been distributed, any remaining distributions will be paid as directed by you or to the Beneficiary's estate, as applicable.

(b) If any Owner dies on or after the Maturity Date, but before all Proceeds payable under the Contract have been distributed, we will continue payments under the Payment Plan in effect at the time of the deceased Owner's death.

If anything in the Contract conflicts with the foregoing Death of Contract Owner provisions, those provisions shall control. The foregoing Death of Contract Owner provisions and the Contract shall, in all events, be construed in a manner consistent with Section 72(s) of the Internal Revenue Code of 1986, as amended.

2.4 **Exemption of Proceeds** - All payments of Proceeds under the Contract will be made from our Customer Service Center. To the extent allowed by law, the payment of the Proceeds will be free from creditors' claims or legal process.

3. **PREMIUMS** – The Initial Premium for this Contract is payable no later than the Contract Date. There is no Contract until the Initial Premium is paid. The amount of the Initial Premium is shown on the Contract Data Page. If any check presented as payment of any part of the Initial Premium is not honored, the Contract will be void.

You may make Additional Premium payments at any time while this Contract is in force prior to its Maturity Date if the Annuitant is alive. The minimum Additional Premium payment we will accept is $500. Our prior approval is required for any Additional Premium payment if that Additional Premium payment would cause the sum of all Premium payments to equal or exceed $1,000,000. Remit the Additional Premium payments to our Customer Service Center or financial representative at the address shown on the cover page.

3.1 **Electing Strategies** – You elect the Strategies for your Premiums from among those described in the Contract and offered by us. Your election of Strategies to any Additional Premium payments will be the same proportion as for your Initial Premium, unless otherwise directed. At any time during the 30-day period following a Contract Anniversary, you may re-elect all or a portion of the Accumulation Value in any Strategy to any other Strategy. No Surrender Charge will apply. Such Re-elections are effective on the Contract Anniversary immediately preceding the Re-election and interest/Index Credits will be applied as though the Re-election was in effect on such Contract Anniversary. Re-election requests must be in a form acceptable to us.

We may cease to accept Additional Premium payments or Re-elections to any specific Strategy(ies) at any time. Any Additional Premium/Re-election is subject to the terms and conditions in existence for any Strategy(ies) available at that time.

## 4. OWNERSHIP, ASSIGNMENT, AND BENEFICIARY PROVISIONS

4.1 **Ownership** - As the Owner, you may exercise the rights given by the Contract. You may change the Owner at any time prior to the Maturity Date, provided, however, the new Owner's age may not be greater than the older of age 80 or the age of the current Owner. To change ownership, you must notify our Customer Service Center in a form acceptable to us. The change will go into effect when recorded by us, subject to any payments we make or actions we take before we record the change. We are not responsible for any tax consequences resulting from any change of ownership.

4.2 **Assigning Your Contract** - You may assign your rights under the Contract to someone else. Such an assignment is not a change of ownership. Consent of any irrevocable Beneficiary(ies) is required before any such assignment is effective.

To assign your Contract, you must notify our Customer Service Center in a form acceptable to us. The change will go into effect when we receive the assignment, or a copy, and it is recorded by us, subject to any payments we make or actions we take before we record the change. We are not responsible for the validity or effect of any assignment, including any tax consequences.

**4.3  Beneficiary** – The rights of the Beneficiary(ies) will be subject to any assignment of the Contract which is recorded by us.

Unless you state otherwise, all rights of any Beneficiary, including an irrevocable Beneficiary, will end if he or she dies before the Owner. If any Beneficiary dies before the Owner, that Beneficiary's rights under this Contract will pass to any other Beneficiaries according to their respective rights under this Contract. If all Beneficiaries die before the Owner, upon the Owner's death we will pay the Proceeds to the Owner's estate or legal successors.

You may change the Beneficiary(ies) at any time prior to the Maturity Date. A change cancels all prior Beneficiaries in the same specified class unless you elect otherwise. However, the rights of any irrevocable Beneficiary(ies) may not be changed without his or her consent.

To make a Beneficiary change, you must notify our Customer Service Center in a form acceptable to us. The change will go into effect when recorded by us, subject to any payments we make or actions we take before we record the change.

**4.4  Simultaneous Death of Beneficiary and Owner** – Proceeds will be paid as though any Beneficiary died before the Owner if the Beneficiary dies:
(a)  at the same time as the Owner; or
(b)  within 24 hours of the Owner's death.

## 5.  GUARANTEED CONTRACT VALUES

**5.1  Accumulation Value -** On the Contract Date, the Contract's Accumulation Value equals the Initial Premium paid less any Premium Tax, if applicable. At any time after the Contract Date, the Contract's Accumulation Value equals the sum of the Accumulation Value of the Strategy(ies) chosen. The Accumulation Value for each Strategy is calculated separately as set forth in Section 6 of this Contract.

**5.2  Cash Surrender Value** – The Cash Surrender Value of this Contract equals the greater of:
(a)  The Minimum Guaranteed Contract Value; or
(b)  The Accumulation Value, less any Surrender Charge.

During the first Contract Year, partial Surrenders of interest credited to the Fixed Rate Strategy are not subject to a Surrender Charge. In any Contract Year after the first, if partial Surrenders do not exceed 10% of the Contract's Accumulation Value, as determined on the date of the first partial Surrender during that Contract Year, the amount Surrendered is not subject to a Surrender Charge. If total Surrenders in any Contract Year exceed these amounts ("Excess Partial Withdrawal"), Surrender Charges will apply to the total amount Surrendered (including prior partial Surrenders) during that Contract Year.

**5.3  Surrender Charges** – Surrender Charges are equal to a percentage of the Accumulation Value Surrendered. A Table of Surrender Charges is shown on the Contract Data Page.

**5.4  Minimum Guaranteed Contract Value** - The Minimum Guaranteed Contract Value is defined on the Contract Data Page.

**5.5  Payment Deferral** - We may, at any time, defer payment of the full Cash Surrender Value or any partial Surrender for up to six months after we receive a request for it, contingent upon written approval by the insurance supervisory official in the jurisdiction in which this Contract is issued.

5.6  **Basis of Computation** - The reserves and guaranteed values will at no time be less than the minimum required by the laws of the state in which this Contract is issued.

6.  **STRATEGIES** – You select the Strategy(ies) for which any portion of Premiums/Re-elections are elected, subject to the terms of this Contract. We reserve the right to add Strategies as approved by the Insurance Department of the state in which the Contract is issued. We may cease to offer a specific Strategy or cease to accept Premiums/Re-elections to a specific Strategy at any time. Any Additional Premiums/Re-elections accepted are subject to the terms and conditions in existence for any Strategy(ies) available at that time, including the then existing rates, caps, spreads, and credits, which may differ from the rates, caps, spreads, and credits applicable to previous elections or Re-elections.

6.1  Fixed Rate Strategy

**Strategy Accumulation Value** – Each Premium/Re-election elected for this Strategy will have an associated Accumulation Value. This Strategy's Accumulation Value is the sum of the Accumulation Values for each Premium/Re-election. The Accumulation Value for each Premium/Re-election elected to this Strategy is calculated as follows:

1. On each Election Date, the Accumulation Value equals the Premium/Re-election amount elected to this Strategy, if any, less any Premium Tax, if applicable.
2. At any time during an Election Year, the Accumulation Value of this Strategy equals:
   (i)    The Accumulation Value of this Strategy on the last Election Anniversary; less
   (ii)   Any Re-elections out of this Strategy on the last Election Anniversary; plus
   (iii)  Any Re-elections for this Strategy on the last Election Anniversary; plus
   (iv)   Any Additional Premiums elected into this Strategy; less
   (v)    Adjustments for any partial Surrenders during the Election Year; plus
   (vi)   Interest credited.

   For the purpose of this calculation, during the first Election Year, the Election Date shall be deemed to be "the last Election Anniversary".

3. On each Election Anniversary, the Accumulation Value of this Strategy equals:
   (i)    The Accumulation Value of this Strategy on the last Election Anniversary; less
   (ii)   Any Re-elections out of this Strategy on the last Election Anniversary; plus
   (iii)  Any Re-elections into this Strategy on the last Election Anniversary; plus
   (iv)   Any Additional Premiums elected into this Strategy; less
   (v)    Adjustments for any partial Surrenders during the Election Year; plus
   (vi)   Interest credited.

   For the purpose of this calculation, on the first Election Anniversary, the Election Date shall be deemed to be "the last Election Anniversary".

The portion of any Additional Premiums or Re-elections elected to this Strategy will be credited an interest rate declared in advance by us. This interest rate will be at least equal to the Fixed Rate Strategy minimum guaranteed interest rate shown on the Contract Data Page. The rate of interest credited will not be changed more often than once during any twelve month period. The initial interest rate is also shown on the Contract Data Page.

In case of full or partial Surrender, interest will be credited on the portion of this Strategy's Accumulation Value Surrendered up to the date the transaction is effected. The Accumulation Value of this Strategy at any date within an Election Year will be determined by us with allowance for the time elapsed in the Election Year. No interest will be credited on any Premium Tax deducted.

6.2  **Point-to-Point Participation Index Strategy**

The following definitions apply to the Point-to-Point Participation Index Strategy:

**Indexing Period** means the period over which the Participation Rate is guaranteed and the Index Credit is calculated. Each Premium/Re-election has its own specific Indexing Period. The initial

Indexing Period for each Premium/Re-election begins on the Election Date for that Premium/Re-election and ends on the day before the following Election Anniversary. Subsequent Indexing Periods begin on the Election Anniversary and end on the day before the next Election Anniversary.

**Participation Rate** means the percentage of the Index Change for each Premium/Re-election used in calculating the Index Credit at the end of each Indexing Period. It is declared annually in advance and is guaranteed for one year unless that Premium/Re-election is re-elected to another Strategy. The initial Participation Rate is shown on the Contract Data Page.

**Index Credit** is the amount credited to each Premium/Re-election elected to this Strategy and is based on the performance of the applicable Index as measured over the Indexing Period.

The Index Credit equals the applicable Participation Rate multiplied by any Index Change as described below.

The Index Credit will never be less than zero.

**Index Change** is calculated as (i)/(ii)-1, where
(i) is the Index Number as of the end of the Indexing Period; and
(ii) is the Index Number as of the start of the Indexing Period.

**Strategy Accumulation Value** – Each Premium/Re-election elected for this Strategy will have an associated Accumulation Value. This Strategy's Accumulation Value is the sum of the Accumulation Values for each Premium/Re-election. The Accumulation Value for each Premium/Re-election elected to this Strategy is calculated as follows:
1. On each Election Date, the Accumulation Value equals the Premium/Re-election amount, elected to this Strategy, if any, less any Premium Tax, if applicable.
2. On each Election Anniversary, the Accumulation Value equals:
   (i) The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
   (ii) Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
   (iii) The result multiplied by (1+ the applicable Index Credit)
   For the purpose of this calculation, on the first Election Anniversary, the Election Date shall be deemed to be "the last Election Anniversary".
3. On any other date during the applicable Election Year, the Accumulation Value equals:
   (i) The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
   (ii) Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
   For the purpose of this calculation, during the first Election Year, the Election Date shall be deemed to be "the last Election Anniversary".

## 6.3 Point-to-Point Cap Index Strategy

The following definitions apply to the Point-to-Point Cap Index Strategy:

**Indexing Period** means the period over which the Index Cap is guaranteed and the Index Credit is calculated. Each Premium/Re-election has its own specific Indexing Period. The initial Indexing Period for each Premium/Re-election begins on the Election Date for that Premium/Re-election and ends on the day before the following Election Anniversary. Subsequent Indexing Periods begin on the Election Anniversary and end on the day before the next Election Anniversary.

**Index Cap** means the maximum Index Credit that may be applied at the end of each Indexing Period. It is declared annually in advance and is guaranteed for one year unless that Premium/Re-election is re-elected to another Strategy. The initial Index Cap is shown on the Contract Data Page.

**Index Credit** is the amount credited to each Premium/Re-election elected to this Strategy and is based on the performance of the applicable Index as measured over the Indexing Period.

The Index Credit equals the lesser of the Index Cap or the Index Change as described below.

The Index Credit will never be less than zero.

**Index Change** is calculated as (i)/(ii)-1, where
(i) is the Index Number as of the end of the Indexing Period; and
(ii) is the Index Number as of the start of the Indexing Period.

**Strategy Accumulation Value** – Each Premium/Re-election elected for this Strategy will have an associated Accumulation Value. This Strategy's Accumulation Value is the sum of the Accumulation Values for each Premium/Re-election. The Accumulation Value for each Premium/Re-election elected to this Strategy is calculated as follows:
1. On each Election Date, the Accumulation Value equals the Premium/Re-election amount, elected to this Strategy, if any, less any Premium Tax, if applicable.
2. On each Election Anniversary, the Accumulation Value equals:
   (i)   The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
   (ii)  Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
   (iii) The result multiplied by (1+ the applicable Index Credit)
   For the purpose of this calculation, on the first Election Anniversary, the Election Date shall be deemed to be "the last Election Anniversary".
3. On any other date during the applicable Election Year, the Accumulation Value equals:
   (i)   The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
   (ii)  Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
   For the purpose of this calculation, during the first Election Year, the Election Date shall be deemed to be "the last Election Anniversary".

### 6.4   Monthly Average Index Strategy

The following definitions apply to the Monthly Average Index Strategy:

**Indexing Period** means the period over which the Participation Rate and the Index Spread are guaranteed and the Index Credit is calculated. Each Premium/Re-election has its own specific Indexing Period. The initial Indexing Period for each Premium/Re-election begins on the Election Date for that Premium/Re-election and ends on the day before the following Election Anniversary. Subsequent Indexing Periods begin on the Election Anniversary and end on the day before the next Election Anniversary.

**Monthly Anniversary** means the same day of each month as the Election Date. If the same day does not exist in a month, such as the 31st, we use the preceding day.

**Index Average** means the average of the Index Numbers on each of the twelve Monthly Anniversaries during each Indexing Period. If the Index Number is not available on any Monthly Anniversary, we will use the Index Number on the first preceding day for which the Index Number is available.

**Participation Rate** means the percentage of the Index Change for each Premium/Re-election used in calculating the Index Credit at the end of each Indexing Period. It is declared annually in advance and is guaranteed for one year unless that Premium/Re-election is re-elected to another Strategy. The initial Participation Rate is shown on the Contract Data Page.

**Index Spread** means the amount subtracted from the result of Index Change multiplied by the Participation Rate, in the calculation of the Index Credit at the end of each Indexing Period. It is declared annually in advance and is guaranteed for one year unless that Premium/Re-election is re-elected to another Strategy. The initial Index Spread is shown on the Contract Data Page.

**Index Credit** is the amount credited to each Premium/Re-election elected to this Strategy and is based on the performance of the applicable Index as measured over the Indexing Period.

The Index Credit equals (i)*(ii)-(iii), where
    (i) is the Index Change as described below; and
    (ii) is the Participation Rate; and
    (iii) is the Index Spread.

The Index Credit will never be less than zero.

**Index Change** is calculated as (i)/(ii)-1, where
    (i) is the Index Average; and
    (ii) is the Index Number as of the start of the Indexing Period.

**Strategy Accumulation Value** – Each Premium/Re-election elected for this Strategy will have an associated Accumulation Value. This Strategy's Accumulation Value is the sum of the Accumulation Values for each Premium/Re-election. The Accumulation Value for each Premium/Re-election elected to this Strategy is calculated as follows:
1. On each Election Date, the Accumulation Value equals the Premium/Re-election amount, elected to this Strategy, if any, less any Premium Tax, if applicable.
2. On each Election Anniversary, the Accumulation Value equals:
    (i)    The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
    (ii)    Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
    (iii)    The result multiplied by (1+ the applicable Index Credit)
    For the purpose of this calculation, on the first Election Anniversary, the Election Date shall be deemed to be "the last Election Anniversary".
3. On any other date during the applicable Election Year, the Accumulation Value equals:
    (i)    The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
    (ii)    Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
    For the purpose of this calculation, during the first Election Year, the Election Date shall be deemed to be "the last Election Anniversary".

The following definitions apply to the Monthly Cap Index Strategy:

**Indexing Period** means the period over which the Monthly Cap is guaranteed and the Index Credit is calculated. Each Premium/Re-election has its own specific Indexing Period. The initial Indexing Period for each Premium/Re-election begins on the Election Date for that Premium/Re-election and ends on the day before the following Election Anniversary. Subsequent Indexing Periods begin on the Election Anniversary and end on the day before the next Election Anniversary.

**Monthly Anniversary** means the same day of each month as the Election Date. If the same day does not exist in a month, such as the 31st, we use the preceding day.

**Monthly Cap** is the maximum Monthly Index Change that may be applied in calculating the Index Credit at the end of each Indexing Period. It is declared annually in advance and is guaranteed for one year unless that Premium/Re-election is re-elected to another Strategy. The initial Monthly Cap is shown on the Contract Data Page.

**Monthly Index Change** is the lesser of the Monthly Cap or the result of (i)/(ii) − 1, where
  (i)   is the Index Number on each Monthly Anniversary;
  (ii)  is the Index Number on the prior Monthly Anniversary.

**Index Credit** is the amount credited to the portion of each Premium/Re-elections elected to this Strategy and is based on the performance of the applicable Index as measured over the Indexing Period.

The Index Credit equals the sum of the twelve Monthly Index Changes during the Indexing Period.

The Index Credit will never be less than zero.

**Strategy Accumulation Value** – Each Premium/Re-election elected for this Strategy will have an associated Accumulation Value. This Strategy's  Accumulation Value is the sum of the Accumulation Values for each Premium/Re-election. The Accumulation Value for each Premium/Re-election elected to this Strategy is calculated as follows:
  1. On each Election Date, the Accumulation Value equals the Premium/Re-election amount, elected to this Strategy, if any, less any Premium Tax, if applicable.
  2. On each Election Anniversary, the Accumulation Value equals:
      (i)   The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
      (ii)  Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
      (iii) The result multiplied by (1+ the applicable Index Credit)
     For the purpose of this calculation, on the first Election Anniversary, the Election Date shall be deemed to be "the last Election Anniversary".
  3. On any other date during the applicable Election Year, the Accumulation Value equals:
      (i)   The Accumulation Value of the Premium/Re-election on the last Election Anniversary; less
      (ii)  Adjustments for any partial Surrenders of that Premium/Re-election or Re-elections of that Premium/Re-election out of the Strategy during the Indexing Period.
     For the purpose of this calculation, during the first Election Year, the Election Date shall be deemed to be "the last Election Anniversary".

7. **PAYMENT PLANS** – If the Annuitant is living on the Maturity Date, payment of the Contracts Proceeds must commence as directed by you. You may elect to have the Proceeds paid under any of the Payment Plans described below. In addition, you may elect another method of payment subject to our consent. The method of payment may be changed at any time prior to the Maturity Date, provided the Annuitant is alive. If a Payment Plan is not elected, payments will commence automatically as described in Section 2. The first payment will be paid at the end of the first period marking the frequency of payments. Payment amounts will be determined by applying the greater of the Contracts   Accumulation Value or the Minimum Guaranteed Contract Value on the Maturity Date, less any Premium Tax if applicable, to the Payment Plan elected.

Upon receipt of your request at our Customer Service Center, we will send you the proper forms to choose a Payment Plan. The chosen Payment Plan will go into effect when the forms are recorded at our Customer Service Center.

Election of any Payment Plan is subject to the following terms and conditions.
a) The payments under any periodic Payment Plan must be $100 or more.
b) Our consent is necessary if the person named to receive the payments is other than a natural person (such as a trust or corporation) in order to comply with applicable tax laws.
c) If, for any reason, the person named to receive payments is changed, the change will take effect at the time notification is recorded at our Customer Service Center, subject to any payments made or actions taken prior to the date we record the change.
d) The minimum amounts payable for each of the Payment Plans described below are based on an interest rate of 1.5% annually. We may pay a higher interest rate at our discretion. Payments for Plan C are based on the Annuity 2000 Mortality Table. The minimum payments for Plans B and C assume annual payments with the first payment made one year after the Proceeds are applied to the Payment Plan.

Subject to the provisions set forth above and in Section 2, a Payment Plan may also be elected for the distribution of amounts payable upon death.

7.1 **Plan A. Interest** – Subject to Section 2.3, Proceeds may be left with us for a period of five years, with fixed payments of interest made monthly, quarterly, semi-annually or annually. After five years from the date payments begin, the remaining Proceeds may be withdrawn in one lump sum. We will not allow a monthly payment if the Proceeds applied under this option are less than $100,000.

7.2 **Plan B. Fixed Period** – Proceeds are paid for a fixed period. Payments may be paid monthly or annually. The payment period cannot be more than 30 years nor less than 10 years. The table below shows the minimum annual payment for each $1,000 of Proceeds applied with payments starting one year after the Proceeds have been applied to this Payment Plan.

Minimum Amount of Each Installment Per $1,000 of Proceeds for Plan B

| Years Payable | Annual Installment | Years Payable | Annual Installment | Years Payable | Annual Installment |
|---|---|---|---|---|---|
| 10 | 108.43 | 17 | 67.08 | 24 | 49.92 |
| 11 | 99.29 | 18 | 63.81 | 25 | 48.26 |
| 12 | 91.68 | 19 | 60.88 | 26 | 46.73 |
| 13 | 85.24 | 20 | 58.25 | 27 | 45.32 |
| 14 | 79.72 | 21 | 55.87 | 28 | 44.00 |
| 15 | 74.94 | 22 | 53.70 | 29 | 42.78 |
| 16 | 70.77 | 23 | 51.73 | 30 | 41.64 |

7.3 **Plan C. Life Income** – Proceeds will be paid in monthly or annual payments for as long as the Annuitant or Beneficiary, whichever is appropriate as stated under Section 2, lives. We have the

right to require proof satisfactory to us of the age and sex of such person and that he or she is alive prior to making any payment. A minimum number of payments may be guaranteed, if desired.

The following table shows the minimum annual payment for each $1,000 of Proceeds applied with payments starting one year after the Proceeds have been applied to this Payment Plan. It is based on the age of the Annuitant or Beneficiary, as applicable.

### Minimum Amount of Each Installment Per $1,000 of Proceeds for Plan C

| Age of Payee | Male Annual Installment Guaranteed Period | | | Age of Payee | Female Annual Installment Guaranteed Period | | |
|---|---|---|---|---|---|---|---|
| | Life | 10 Yrs. | 20 Yrs. | | Life | 10 Yrs. | 20 Yrs. |
| 45 | 35.92 | 35.77 | 35.19 | 45 | 33.45 | 33.38 | 33.09 |
| 46 | 36.63 | 36.45 | 35.80 | 46 | 34.04 | 33.96 | 33.64 |
| 47 | 37.36 | 37.15 | 36.42 | 47 | 34.67 | 34.58 | 34.21 |
| 48 | 38.13 | 37.89 | 37.07 | 48 | 35.32 | 35.22 | 34.80 |
| 49 | 38.93 | 38.66 | 37.74 | 49 | 36.01 | 35.89 | 35.42 |
| 50 | 39.77 | 39.47 | 38.43 | 50 | 36.73 | 36.59 | 36.05 |
| 51 | 40.65 | 40.31 | 39.15 | 51 | 37.48 | 37.33 | 36.72 |
| 52 | 41.58 | 41.20 | 39.88 | 52 | 38.28 | 38.10 | 37.40 |
| 53 | 42.56 | 42.13 | 40.63 | 53 | 39.11 | 38.91 | 38.12 |
| 54 | 43.59 | 43.10 | 41.41 | 54 | 40.00 | 39.76 | 38.86 |
| 55 | 44.67 | 44.12 | 42.20 | 55 | 40.93 | 40.66 | 39.62 |
| 56 | 45.82 | 45.20 | 43.01 | 56 | 41.91 | 41.60 | 40.41 |
| 57 | 47.03 | 46.33 | 43.83 | 57 | 42.94 | 42.59 | 41.23 |
| 58 | 48.32 | 47.53 | 44.66 | 58 | 44.04 | 43.63 | 42.07 |
| 59 | 49.70 | 48.78 | 45.51 | 59 | 45.21 | 44.74 | 42.94 |
| 60 | 51.16 | 50.10 | 46.36 | 60 | 46.44 | 45.90 | 43.82 |
| 61 | 52.72 | 51.50 | 47.22 | 61 | 47.76 | 47.12 | 44.72 |
| 62 | 54.39 | 52.96 | 48.07 | 62 | 49.16 | 48.42 | 45.64 |
| 63 | 56.17 | 54.49 | 48.91 | 63 | 50.65 | 49.79 | 46.57 |
| 64 | 58.07 | 56.10 | 49.75 | 64 | 52.23 | 51.23 | 47.50 |
| 65 | 60.10 | 57.79 | 50.56 | 65 | 53.93 | 52.76 | 48.43 |
| 66 | 62.28 | 59.54 | 51.34 | 66 | 55.74 | 54.37 | 49.35 |
| 67 | 64.60 | 61.37 | 52.10 | 67 | 57.69 | 56.06 | 50.25 |
| 68 | 67.08 | 63.27 | 52.81 | 68 | 59.78 | 57.86 | 51.13 |
| 69 | 69.73 | 65.23 | 53.49 | 69 | 62.03 | 59.74 | 51.98 |
| 70 | 72.57 | 67.25 | 54.12 | 70 | 64.46 | 61.73 | 52.78 |
| 71 | 75.59 | 69.33 | 54.70 | 71 | 67.09 | 63.81 | 53.53 |
| 72 | 78.83 | 71.46 | 55.23 | 72 | 69.93 | 65.99 | 54.23 |
| 73 | 82.29 | 73.63 | 55.71 | 73 | 73.01 | 68.26 | 54.86 |
| 74 | 86.01 | 75.83 | 56.13 | 74 | 76.35 | 70.61 | 55.43 |
| 75 | 89.99 | 78.05 | 56.51 | 75 | 79.97 | 73.03 | 55.93 |
| 76 | 94.28 | 80.28 | 56.83 | 76 | 83.90 | 75.50 | 56.36 |
| 77 | 98.88 | 82.51 | 57.12 | 77 | 88.17 | 78.02 | 56.74 |
| 78 | 103.83 | 84.71 | 57.35 | 78 | 92.81 | 80.55 | 57.06 |
| 79 | 109.16 | 86.86 | 57.55 | 79 | 97.86 | 83.07 | 57.32 |
| 80 | 114.89 | 88.96 | 57.72 | 80 | 103.37 | 85.56 | 57.54 |

Factors for ages not shown will be supplied upon request.

## 8.  GENERAL TERMS

**8.1  The Contract** – This is a legal Contract between you and us. This Contract, which consists of this document and any attached application, amendments, endorsements or riders, contains the entire agreement between you and us. It is issued in consideration of the Initial Premium paid. Only our President, a Vice President or Secretary is authorized to change, modify or waive the provisions of the Contract. Any such change, modification or waiver must be in writing.

The provisions of the Contract shall, in all events, be construed to comply with the requirements of Section 72(s) of the Internal Revenue Code of 1986, as amended.

**8.2  Incontestability** - This Contract shall be incontestable from the Contract Date.

**8.3  Valid Release for Payment** - If Proceeds are payable to a person not legally competent to give a valid release as determined by a Court of competent jurisdiction, we may pay Proceeds in monthly installments, not to exceed $100, to the person or persons who have, as determined by the Court, assumed custody and principal support of the person. Any payment made under this clause will be made in good faith. It will satisfy our responsibility under this Contract to the extent of any payments made.

**8.4  Option to Change Maturity Date** - You may elect a new Maturity Date, in any Contract Year after the first, by making a written request to us at our Customer Service Center at least 30 days prior to the Maturity Date. We may require that the Contract be submitted for endorsement to show the change.

**8.5  Annual Statement of Values** - At least once each year we will send you a statement which shows the following values as of the statement date:
    (a)  the amount of Premiums paid;
    (b)  the amount and dates of any partial Surrenders;
    (c)  the Accumulation Value; and
    (d)  the Cash Surrender Value.

**8.6  Mistake of Age or Sex** - If the Annuitant's age or sex has been misstated, we will adjust the payment of Proceeds based on the correct age and sex. Any underpayment made by us will be made up immediately. Any overpayment made by us will be deducted from the succeeding payments as necessary. By age, we mean the Annuitant's age as of his or her last birthday on the Contract Date.

(This page intentionally left blank.)

**VOYA
INSURANCE AND
ANNUITY COMPANY**

*Voya Insurance and Annuity Company is a stock company domiciled in Iowa*
(HEREINAFTER CALLED WE, US AND OUR)

**Cash Surrender Value
Endorsement**

The Contract to which this Cash Surrender Value Endorsement (this "Endorsement") is attached is hereby modified by the provisions of this Endorsement. The Endorsement's provisions shall control when there is a conflict between this Endorsement and the Contract. Any capitalized terms not defined in this Endorsement shall have the meaning given to them in the Contract. This Endorsement is effective as of the Contract Date.

The "Cash Surrender Value" provision is deleted in its entirety and replaced with the following:

**Cash Surrender Value** – The Cash Surrender Value of this Contract equals the greater of:
(a)  The Minimum Guaranteed Contract Value; or
(b)  The Accumulation Value, less any applicable Surrender Charge.

During the first Contract Year, partial Surrenders of interest credited to the Fixed Rate Strategy are not subject to a Surrender Charge. In any Contract Year after the first, if partial Surrenders do not exceed 10% of the Contract's Accumulation Value, as determined on the date of the first partial Surrender during that Contract Year, the amount Surrendered is not subject to a Surrender Charge. If partial Surrenders in any Contract Year exceed these amounts ("Excess Partial Withdrawals"), applicable Surrender Charges will apply to the total amount of the Excess Partial Withdrawals. In the event of a full Surrender, applicable Surrender Charges will apply to the total amount Surrendered during that Contract Year, including prior partial Surrenders not defined as Excess Partial Withdrawals.

All other terms and provisions of the Contract remain unchanged.

Signed:

*Joy M. Benner*

Secretary

IU-RA-3082

# Voya Insurance and Annuity Company

Waiver of Surrender Charge Rider

*Voya Insurance and Annuity Company is a stock company domiciled in Iowa.*

Voya Insurance and Annuity Company ("we" or "us") will waive any Surrender Charge incurred due to a surrender or Excess Partial Withdrawal under the Contract in the event the Owner ("you") is subject to Qualified Extended Medical Care or suffers from a Qualifying Terminal Illness subject to the terms and conditions stated below:

**Extended Medical Care**

To qualify for this waiver, you must first begin receiving Qualified Extended Medical Care on or after the first Contract Anniversary for at least 45 days during any continuous sixty-day period, and your request for the surrender or withdrawal, together with proof of such Qualified Extended Medical Care, must be received at our Customer Service Center during the term of such care or within ninety days after the last day upon which you received such care.

"Qualified Extended Medical Care" means confinement in a Qualified Licensed Hospital or Nursing Care Facility prescribed by a Qualifying Medical Professional.

"Qualifying Licensed Hospital or Nursing Care Facility" means a state-licensed hospital or state-licensed skilled or intermediate care nursing facility at which medical treatment is available on a daily basis; and daily medical records are kept on each patient. This does not include a facility whose purpose is to provide accommodations, board or personal care services to individuals who do not need medical or nursing care; nor a place mainly for rest.

"Qualifying Medical Professional" means a legally-qualified practitioner of the healing arts who is acting within the scope of his or her license; is not a resident of your household or that of the Annuitant; and is not related to you or the Annuitant by blood or marriage.

**Terminal Illness**

To qualify for this waiver, you must be first diagnosed by a Qualifying Medical Professional, on or after the first Contract Anniversary, as having a Qualifying Terminal Illness. Written proof of terminal illness, satisfactory to us, must be received at our Customer Service Center. We reserve the right to require an examination by a physician of our choice.

"Qualifying Terminal Illness" means an illness or accident, the result of which results in a life expectancy of twelve months or less, as measured from the date of diagnosis.

**Claims**

Evidence, satisfactory to us, must be submitted to qualify for waiver of Surrender Charge pursuant to this Rider. This evidence will be in writing and, where applicable, be attested to by a Qualified Medical Professional.

This Rider is attached to and becomes part of the Contract to which it is attached. The provisions of this Rider will supersede the provisions of the Contract where applicable.

### VOYA INSURANCE AND ANNUITY COMPANY

President _____     Secretary _____

**Voya Insurance and
Annuity Company**

**Individual Retirement
Annuity Rider**

*A Stock Company Domiciled in Iowa*

The following language amends the Contract to which it is attached in order that such Contract may be treated as an Individual Retirement Annuity (IRA) under Section 408(b) of the Internal Revenue Code, as amended from time to time. The effective date of this Rider is the later of January 1, 2002, or the Contract Date

In the event of any conflict between the provisions of this Rider and the Contract to which it is attached, the provisions of this Rider will control.

1.  All references in this Rider to:
    (a) "IRC" means the Internal Revenue Code of 1986, as amended from time to time.
    (b) "Contract" means the Contract or Certificate to which this Rider is attached.
    (c) "Owner" means the Owner of the Contract to which this Rider is attached.
    (d) "Designated Beneficiary" means the beneficiary named by the Owner in the Contract.
    (e) "We", "our", and "us" means Voya Insurance and Annuity Company.

2.  **Nonforfeitability and Nontransferability.**

    This Contract shall be for the exclusive benefit of the Owner or his or her beneficiary. The Owner's rights under this Contract shall be nonforfeitable.

    This Contract is nontransferable. Other than to us, it may not be sold, assigned, discounted or pledged as collateral for a loan or as a security for the performance of an obligation or for any other purpose.

3.  **Contributions.**

    (a) Except in the case of a rollover contribution (as permitted by Internal Revenue Code Sections 402(c), 402(e)(6), 403(a)(4), 403(b)(8), 403(b)(10), 408(d)(3) and 457(e)(16)) or a contribution made in accordance with the terms of a Simplified Employee Pension (SEP) as described in Section 408(k), no contributions will be accepted unless they are in cash, and the total of such contributions shall not exceed:
    (i)   $3,000 for taxable years 2002 through 2004;
    (ii)  $4,000 for taxable years 2005 through 2007; and
    (iii) $5,000 for taxable year 2008 and later.

    After 2008, the limit will be adjusted by the Secretary of the Treasury for cost-of-living increases under IRC Section 219(b)(5)(C). Such adjustments will be in multiples of $500.

    This Contract does not require fixed premium payments.

    (b) In the case of an individual who has attained age 50 before the close of the year, the annual cash contribution limit is increased by:
    $500 for taxable years 2002 through 2005; and
    $1,000 for taxable years 2006 and later.

RA-2007

(c) No contributions will be accepted under a SIMPLE IRA plan established by any employer pursuant to Code Section 408(p). No transfer or rollover of funds attributable to contributions made by a particular employer under its SIMPLE IRA plan will be accepted from a SIMPLE IRA, that is, an IRA used in conjunction with a SIMPLE IRA plan, prior to the expiration of the 2-year period beginning on the date the individual first participated in that employer's SIMPLE IRA plan.

Any refund of premiums (other than those attributable to excess contributions) will be applied, before the close of the calendar year following the year of the refund, toward the payment of future premiums or the purchase of additional benefits.

4.   **Distributions Before Death Must Commence No Later Than Age 70 ½.**

(a)   Not withstanding any provision of this IRA to the contrary, the distribution of the Owner's interest in the IRA shall be made in accordance with the requirements of IRC Section 408(b)(3) and the regulations there under, the provisions of which are herein incorporated by reference. If distributions are not made in the form of an annuity on an irrevocable basis (except for acceleration), then distribution of the interest in the IRA (as determined under Section 4(c) below), must satisfy the requirements of IRC Section 408(a)(6) and the regulations there under rather than paragraphs (b), (c) and (d) below, and Section 5 of this Rider.

(b)   The entire interest of the Owner will commence to be distributed no later than the first day of April following the calendar year in which the Owner attains age 70 ½ (the "required beginning date") over: (1.) the life of the Owner or the lives of the Owner and his or her Designated Beneficiary; or (2.) a period certain not extending beyond the life expectancy of the Owner, or joint and last survivor expectancy of the Owner and his or her Designated Beneficiary. Payments must be made in periodic payments at intervals of no longer than 1 year and must be either non-increasing or they may increase only as provided in Q & As -1 and −4 of Section 1.401(a)(9)-6T of the Temporary Income Tax Regulations (or as provided in such Final Regulations as may be subsequently published). In addition, any distribution must satisfy the incidental benefit requirements specified in Q & A - 2 of Section 1.401(a)(9)-6T.

(c)   The distribution periods described in paragraph (b) above cannot exceed the periods specified in Section 1.401(a)(9)-6T of the Temporary Income Tax Regulations (or as provided in such Final Regulations as may be subsequently published).

(d)   The first required payment can be made as late as April 1 of the year following the year the Owner attains age 70 ½ and must be the payment that is required for one payment interval. The second payment need not be made until the end of the next payment interval.

5.   **Distribution Upon Death**

(a)   Death on or After Required Distributions Commence. If the Owner dies on or after required distributions commence, the remaining portion of his or her interest will continue to be distributed under the contract option chosen.

(b)   Death Before Required Distributions Commence. If the Owner dies before required Distributions commence, his or her entire interest will be distributed at least as rapidly as follows:

(1)    If the Designated Beneficiary is someone other than the Owner's surviving spouse, the entire interest will be distributed, starting by the end of the calendar year following the calendar year of the Owner's death, over the remaining life expectancy of the Designated Beneficiary, with such life expectancy determined using the age of the Designated Beneficiary as of his or her birthday in the year following the year of the individual's death, or if elected, in accordance with paragraph (b)(3) below.

(2)    If the Owner's sole Designated Beneficiary is the Owner's surviving spouse, the entire interest will be distributed, starting by the end of the calendar year following the calendar year of the Owner's death (or by the end of the calendar year in which the Owner would have attained age 70 ½, if later), over such spouse's life, or if elected, in accordance with paragraph (b)(3) below. If the surviving spouse dies before required distributions commence to him or her, the remaining interest will be distributed, starting by the end of the calendar year following the calendar year of the spouse's death, over the spouse's Designated Beneficiary's remaining life expectancy determined using such beneficiary's age as of his or her birthday in the year following the death of the spouse, or if elected, will be distributed in accordance with paragraph (b)(3) below. If the surviving spouse dies after the required distributions commence to him or her, any remaining interest will continue to be distributed under the contract option chosen.

(3)    If there is no Designated Beneficiary, or if applicable by operation of paragraph (b)(1) or (b)(2) above, the entire interest will be distributed by the end of the calendar year containing the fifth anniversary of the Owner's death (or of the spouse's death in the case of the surviving spouse's death before distributions are required to begin under paragraph (b)(2) above).

(4)    Life expectancy is determined using the Single Life Table in Q & A – 1 of Section 1.401(a)(9)-9 of the Income Tax Regulations. If distributions are being made to a surviving spouse as the sole Designated Beneficiary, such spouse's remaining life expectancy for a year is the number in the Single Life Table corresponding to such spouse's age in the year. In all other cases, remaining life expectancy for a year is the number in the Single Life Table corresponding to the beneficiary's age in the year specified in paragraph (b)(1) or (2) above and reduced by 1 for each subsequent year.

(c)    The "interest" in the IRA includes the amount of any outstanding rollover, transfer, and recharacterization under Q & As – 7 and – 8 of Section 1.408-8 of the Income Tax Regulations and the actuarial value of any other benefits provided under the IRA, such as guaranteed death benefits.

(d)    For purposes of paragraphs (a) and (b) above, required distributions are considered to commence on the Owner's required beginning date or, if applicable, on the date distributions are required to begin to the surviving spouse under paragraph (b)(2) above. However, if distributions start prior to the applicable date in the preceding sentence, on an irrevocable basis (except for acceleration) under an annuity contract meeting the requirements of Section 1.401(a)(9)-6T of the Temporary Income Tax Regulations (or as provided in such Final Regulations as may be subsequently published), then required distributions are considered to commence on the annuity starting date.

(e)    If the sole Designated Beneficiary is the Owner's surviving spouse, the spouse may elect to treat the IRA as his or her own IRA. This election will be deemed to have been made if such surviving spouse makes a contribution to the IRA or fails to take required distributions as a beneficiary.

6.    **Amendments.** We reserve the right to amend or administer this Contract and Rider as necessary to comply with the provisions of the IRC, Internal Revenue Service Regulations or published Internal Revenue Service Rulings. We will send a copy of such amendment to the Owner. It will be mailed to the last post office address known to us. Any such changes will apply uniformly to all Contracts that are affected and the Owner will have the right to accept or reject such changes.

7.    **Periodic Reports.** We will send the Owner an annual report that shows the status of the Contract as of the end of each calendar year and such information concerning required minimum distributions as is prescribed by the Commissioner of Internal Revenue.

All other provisions of the Contract to which this Rider is attached remain unchanged.

Signed for **Voya Insurance and Annuity Company:**

*President*

**VOYA
INSURANCE AND
ANNUITY COMPANY**

*Voya Insurance and Annuity Company is a stock company domiciled in Iowa*

(HEREINAFTER CALLED WE, US AND OUR)

'y to
nal
ed to
that

ct as
ns as

## Minimum Guaranteed Withdrawal Benefit Rider

### RIDER DATA TABLE

| Contract Number | ███████ |
| --- | --- |
| Rider Effective Date | January 20, 2011 |
| Accumulation Period | 10 Contract Years |
| MGWB Charge Rate | 0.40% Annually of the MGWB Base |
| Index Strategy Vesting Percentage | 100.00% |
| Fixed Rate Strategy Vesting Percentage | 100.00% |
| MGWB Reimbursement Percentage | 100.00% |
| Withdrawal Phase Rollup Rate | 0.00% Annual |
| Accumulation Period Rollup Rate | 7.00% Annual |

**Maximum Annual Withdrawal Percentage**

| Age of Annuitant at time of first Withdrawal | Percentage |
| --- | --- |
| 50-54 | 4.00% |
| 55-59 | 4.50% |
| 60-64 | 5.00% |
| 65-69 | 5.50% |
| 70-74 | 6.00% |
| 75-79 | 6.50% |
| 80-84 | 7.00% |
| 85-89 | 7.50% |
| 90+ | 8.00% |

IU-RA-3059(08/08)                    1

# Minimum Guaranteed Withdrawal Benefit Rider

The Contract to which this Minimum Guaranteed Withdrawal Benefit Rider (this "Rider") is attached is hereby modified by the provisions of this Rider. The Rider's provisions shall control when there is a conflict between this Rider and the Contract. Any capitalized terms not defined in this Rider shall have the meaning given to them in the Contract.

Benefits provided and charges assessed under the terms and conditions of this Rider are described below. This Rider will remain in effect until terminated under the conditions described below.

Subject to certain terms and conditions, this Rider guarantees that a certain amount may be withdrawn annually even if the Accumulation Value is zero, until the date of death of the Annuitant (as defined below) or the Rider is terminated.

## 1. IMPORTANT TERMS

The **Accumulation Period** is the number of years during the Deferral Phase in which the Accumulation Period Roll-Up Rate is used in calculating the MGWB Base. The Accumulation Period is shown in the Rider Data Table.

The **Accumulation Period Rollup Rate** is the annual rate used to calculate the MGWB Base during the Accumulation Period. The Accumulation Period Rollup Rate is shown in the Rider Data Table.

The **Adjusted Account Value** on any day will equal (a) + (b) where:
- (a) Equals the sum of all Accumulation Values elected to the Index Strategies prior to any Withdrawals on that day multiplied by the Index Strategy Vesting Percentage; and
- (b) Equals the Accumulation Values elected to the Fixed Rate Strategy prior to any Withdrawals on that day multiplied by the Fixed Rate Strategy Vesting Percentage.

The **Annuitant** means the person, designated by you, on whose life the annuity payments for this Contract are based. You are the Annuitant if no Annuitant is named. The Annuitant may not be changed during the Annuitant's lifetime. The Annuitant must be an Owner (or a Joint Owner) unless the Contract has a non-natural Owner. Joint Annuitants are not allowed on any Contract to which this Rider is attached.

The **Contract** means the Contract to which this Rider is attached.

The **Deferral Phase** is the period of time beginning on the Rider Effective Date and ending on the last day immediately preceding the date of the first Maximum Annual Withdrawal or Contract Maturity Date.

The **Eligible Premiums** include any Premiums or Single Premium paid and any associated Bonus, if applicable, credited to the Contract during the Deferral Phase. No Premium payments are allowed under the Contract during the Withdrawal Phase. We may, however, at our sole discretion, waive this limitation. Any such waiver will apply to all issues of this Rider on a nondiscriminatory basis. No Premium payments are allowed under the Contract while this Rider is in Automatic Periodic Benefit Status (as defined below).

An **Excess MGWB Withdrawal** is an amount equal to the excess of the total Withdrawals, over the then current MAW, or full Surrender in any Contract Year.

The **Fixed Rate Strategy Vesting Percentage** is a percentage rate used to calculate the amount of Eligible Premium elected to the Fixed Rate Strategy that is included in the MGWB Base. The Fixed Rate Strategy Vesting Percentage is shown in the Rider Data Table.

The **Index Strategy Vesting Percentage** is a percentage rate used to calculate the amount of Eligible Premium elected to the Index Strategies that is included in the MGWB Base. The Index Strategy Vesting Percentage is shown in the Rider Data Table.

The **Maximum Annual Withdrawal or MAW** is the maximum Accumulation Value that can be withdrawn from the Contract in any Contract Year without reducing the Rider benefit guarantees in future Contract Years.

The **MGWB Base** is a value used only for the purpose of calculating MGWB Charges and the MAW.

The **MGWB Charge** is the charge calculated by an annual percentage rate of the MGWB Base. This annual rate is the MGWB Charge Rate shown in the Rider Data Table.

The **MGWB Reimbursement Percentage** is an annual percentage rate used to calculate an amount by which the Accumulation Value will be increased in certain circumstances. The MGWB Reimbursement Percentage is shown in the Rider Data Table.

A **Non-Maximum Annual Withdrawal or Non-MAW** is an amount of Accumulation Value that can be withdrawn from the Contract during the Deferral Phase that will reduce the Rider benefit guarantees on a pro-rata basis. A Non-MAW will not begin the Withdrawal Phase.

The **Rider Effective Date** is the date this Rider becomes effective. The Rider Effective Date is the same as the Contract Date unless a different Rider Effective Date is shown in the Rider Data Table.

A **Withdrawal** means any partial Surrender.

The **Withdrawal Phase** begins as of the date of the first Maximum Annual Withdrawal or the Contract Maturity Date, whichever occurs first.

The **Withdrawal Phase Rollup Rate** is the annual percentage rate used to calculate the MGWB Base during the Withdrawal Phase. The Withdrawal Phase Rollup Rate is shown in the Rider Data Table.

## 2. GUARANTEED WITHDRAWAL STATUS

This Rider is placed in the Guaranteed Withdrawal Status on the Rider Effective Date. During the Guaranteed Withdrawal Status, the Rider may be in the Deferral Phase or the Withdrawal Phase. While in Guaranteed Withdrawal Status, the benefits provided under the Contract continue and the Rider guarantees that an amount equal to the MAW (as calculated below) will be available for Withdrawal each Contract Year, subject to certain conditions. Guaranteed Withdrawal Status will be maintained while all of the following conditions exist:
    (1) The Contract's Accumulation Value is greater than zero;
    (2) The Maturity Date under the Contract has not been reached;
    (3) The Contract has not been fully Surrendered or otherwise terminated; and
    (4) The Annuitant is living.

### Calculation of the MGWB Base

**During the Deferral Phase**
The MGWB Base is calculated during the Deferral Phase, only for the purpose of determining the initial MAW and the MGWB Charges. On the first day of the Deferral Phase, the MGWB Base is equal to the Adjusted Account Value.

Thereafter, on each day of the Accumulation Period, the MGWB Base is equal to:
    (1) The MGWB Base as of the end of the prior day; plus
    (2) Daily accumulation based on the annual Accumulation Period Rollup Rate; plus
    (3) Any Eligible Premium received on the current day and elected to the Index Strategy, multiplied by the Index Strategy Vesting Percentage; plus
    (4) Any Eligible Premium received on the current day and elected to the Fixed Rate Strategy multiplied by the Fixed Rate Strategy Vesting Percentage; plus

   (5) The sum of all Re-elections from the Fixed Rate Strategy into the Index Strategies on the current day, multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (6) The sum of all Re-elections from the Index Strategies into the Fixed Rate Strategy on the current day, multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (7) Any adjustments for Withdrawals occurring on the current day (see Treatment of Withdrawals provision).

On any day other than during the Accumulation Period, the MGWB Base is equal to:

   (1) The MGWB Base as of the end of the prior day; plus

   (2) Any Eligible Premium received on the current day and elected to the Index Strategies, multiplied by the Index Strategy Vesting Percentage; plus

   (3) Any Eligible Premium received on the current day and elected to the Fixed Rate Strategy multiplied by the Fixed Rate Strategy Vesting Percentage; plus

   (4) The sum of all Re-elections from the Fixed Rate Strategy into the Index Strategies on the current day multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (5) The sum of all Re-elections from the Index Strategies into the Fixed Rate Strategy on the current day multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (6) Any adjustments for Withdrawals occurring on the current day (see Treatment of Withdrawals provision).

However, on any Contract Anniversary during the Deferral Phase, if the Adjusted Account Value exceeds the MGWB Base as calculated above, the MGWB Base will be reset to equal the Adjusted Account Value.

**During the Withdrawal Phase**
On the first day of the Withdrawal Phase, the MGWB Base is equal to the greater of the Adjusted Account Value or:

   (1) The MGWB Base as of the end of the prior day; plus

   (2) Daily accumulation based on the Withdrawal Phase Rollup Rate; plus

   (3) The sum of all Re-elections from the Fixed Rate Strategy into the Index Strategies on the current day multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (4) The sum of all Re-elections from the Index Strategies into the Fixed Rate Strategy on the current day multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (5) Any adjustments for Excess MGWB Withdrawals occurring on the current day (See Treatment of Withdrawals).

Thereafter, on each day of the Withdrawal Phase, the MGWB Base is equal to:

   (1) The MGWB Base as of the end of the prior day; plus

   (2) Daily accumulation based on the Withdrawal Phase Rollup Rate; plus

   (3) The sum of all Re-elections from the Fixed Rate Strategy into the Index Strategies on the current day multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (4) The sum of all Re-elections from the Index Strategies into the Fixed Rate Strategy on the current day multiplied by (1.00 minus the Fixed Rate Strategy Vesting Percentage); minus

   (5) Any adjustments for Excess MGWB Withdrawals occurring on the current day (See Treatment of Withdrawals).

However, on any Contract Anniversary during the Withdrawal Phase, if the Adjusted Account Value exceeds the MGWB Base as calculated above, the MGWB Base will be reset to equal the Adjusted Account Value. Calculation of the MGWB Base will cease on the date the Rider is terminated, when the Rider enters Automatic Periodic Benefit Status or when the Maturity Date is reached, whichever occurs first.

**MAW Calculation**
The initial MAW is set equal to (1) multiplied by (2) as of the date the Withdrawal Phase begins where:

   (1) Equals the applicable MAW percentage, as shown in the Rider Data Table, based on the age of the Annuitant; and

   (2) Equals the MGWB Base on the first day of the Withdrawal Phase.

Thereafter, the MAW will be recalculated as of each Contract Anniversary and at the time of any Excess MGWB Withdrawal and will be to equal (1) multiplied by (2), where:

(1) Equals the MAW percentage used to determine the initial MAW; and
(2) Equals the MGWB Base at the time the MAW is recalculated.

Once it is determined on the first day of the Withdrawal Phase, the MAW percentage will not change.

**Treatment of Withdrawals**

During the Deferral Phase, you may designate any Withdrawal a MAW or Non-MAW. A MAW will begin the Withdrawal Phase and a Non-MAW will not begin the Withdrawal Phase. Withdrawals designated as a Non-MAW may be taken from the Accumulation Value. Withdrawals designated as Non-MAW will immediately reduce the MGWB Base. The proportion of the reduction of the MGWB Base is equal to:

$$A/B$$

Where: A is the amount of the Non-MAW, including any applicable Surrender Charges, Bonus Recapture and Market Value Adjustment; B is the Contract's Accumulation Value immediately prior to the Withdrawal.

If a MAW is taken in the same Contract Year as a Non-MAW, Surrender Charges, Bonus Recapture and Market Value Adjustment may apply if the total of the Withdrawals in that Contract Year result in an Excess Partial Withdrawals stated in the Contract. Any applicable Surrender Charges, Bonus Recapture and Market Value Adjustment will result in a reduction of the MGWB Base. The reduction in the MGWB Base is equal to:

$$A/(B-C)$$

Where: A is the amount of the charges that result from the MAW taken in the same year as the Non-MAW; B is the Contract's Accumulation Value immediately prior to the Withdrawal; and C is the MAW.

In the Withdrawal Phase, total Withdrawals in any Contract Year not exceeding the then current MAW will not impact the MGWB Base. However, any Excess MGWB Withdrawal will immediately reduce the MGWB Base and the MAW will be recalculated. The proportion of the reduction of the MGWB Base will equal:

$$\frac{A}{\{B - (C - A)\}}$$

Where: A is the amount of the Excess MGWB Withdrawal; B is the Contract's Accumulation Value immediately prior to the Withdrawal; and C is the total amount of the current Withdrawal. This means the MGWB Base is reduced by the same percentage that the Accumulation Value is reduced by the Excess MGWB Withdrawal, rather by the dollar amount of the Excess MGWB Withdrawal.

We will not assess any applicable Surrender Charges, Bonus Recapture or Market Value Adjustment on Withdrawals taken less than or equal to the MAW for the Contract Year. However, if any Withdrawal exceeds the MAW in a given Contract Year, the full amount withdrawn for the Contract Year may be subject to applicable Surrender Charges, Bonus Recapture and any Market Value Adjustment. The amount in excess (including any applicable Surrender Charges, Bonus Recapture and any Market Value Adjustment) will reduce the MGWB Base on a pro-rata basis.

For the purpose of determining whether the MAW has been exceeded, any applicable Market Value Adjustment, Surrender Charges or Bonus Recapture will not be applied to the Withdrawal. However, for the purpose of determining the reduction to the MGWB Base after an Excess MGWB Withdrawal, any applicable Market Value Adjustment, Surrender Charges and Bonus Recapture are considered part of the Withdrawal.

If the Contract is a Contract that is required to satisfy the Required Minimum Distribution rules of the Internal Revenue Code of 1986, as amended, Withdrawals taken from this Contract during the Deferral

Phase to satisfy such rules (the "RMD") may be designated a Non-MAW, but the RMD will result in a pro-rata reduction of the MGWB Base. The RMDs taken in the Withdrawal Phase that exceed the MAW for a specific Contract Year will not be deemed Excess MGWB Withdrawals in that Contract Year, subject to the following:

(1) If the Owner's RMD for any calendar year, applicable to this Contract, is greater than the MAW, an additional withdrawal amount ("AWA") will be set equal to the portion of the RMD that exceeds the MAW. Otherwise, the AWA for that calendar year will be set equal to zero.

(2) Any Withdrawals taken during the then current Contract Year will count first against the MAW for that Contract Year.

(3) The amounts withdrawn in excess of the MAW will count first against any unused AWA calculated for the previous calendar year followed by any unused AWA calculated for the current calendar year. These Withdrawals are not considered Excess MGWB Withdrawals.

(4) Any unused AWA will be set to zero at the end of the second calendar year from which it is originally calculated.

(5) Withdrawals in excess of the MAW and unused accumulated AWA in the Contract will reduce the MGWB Base on a pro-rata basis which will result in a recalculation of the MAW, as described above.

If an Owner dies after beginning to receive RMDs, an AWA will continue to be calculated for any Withdrawals that continue to the Beneficiary. If the Owner dies before beginning receipt of RMDs and Withdrawals are paid to the Beneficiary based on the life expectancy of such Beneficiary, an AWA will not be calculated for the difference between the MAW and any such life expectancy Withdrawals. Under no circumstances will an AWA be calculated for payments under a Contract that is not required to take an RMD. Unless specifically stated otherwise in this Rider, any provisions in the Contract establishing required minimum value remaining after a Withdrawal are superseded and replaced by the provisions of this Rider.

### Lifetime Income Annuity Option

If this Rider is in Guaranteed Withdrawal Status on the Contract's Maturity Date, you must choose one of the Payment Plans set forth in the Contract under which to begin receiving the Contract's Proceeds or Cash Surrender Value, as applicable. Unless a life only Payment Plan is chosen, the minimum annual payments and any conditions imposed will be those listed in the Contract.

If a life only Payment Plan is chosen, payments are made to the Annuitant for life. The amount of such payments are based on the sex and age of the Annuitant, as of the Maturity Date, but will never be less than payments based on the MAW for the same frequency, as of the date payments under the Payment Plans begin. Upon the date of death of the Annuitant, all payments cease.

### 3. AUTOMATIC PERIODIC BENEFIT STATUS

If the Contract's Accumulation Value is reduced to zero (other than by a Withdrawal exceeding the MAW) while the Rider is in Guaranteed Withdrawal Status, the status of the Rider changes to Automatic Periodic Benefit Status and MGWB Periodic Payments (as defined below) will become payable. When the Rider enters Automatic Periodic Benefit Status, the Contract is modified as follows:

(1) The Contract will provide no further benefits other than as provided in this Rider;

(2) No Additional Premium payments will be accepted;

(3) Any other Riders attached to the Contract shall terminate unless specified otherwise in the Rider;

(4) The MGWB Base will stop accumulating and no further MGWB Charges will be deducted.

The MGWB Periodic Payment is an annual amount equal to the MAW in effect on the date the Rider enters Automatic Periodic Benefit Status. The MGWB Periodic Payments will begin on the last day of the first full Contract Year following the date the Rider enters Automatic Periodic Benefit Status and will continue to be paid annually thereafter until the death of the Annuitant. However, if at the time this Rider enters Automatic Periodic Benefit Status, you are receiving systematic Withdrawals under the Contract, the MGWB Periodic Payments will be made at the same frequency and in equal amounts

such that the sum of such payments in each Contract Year will equal the annual MGWB Periodic Payment. Systematic MGWB Periodic Payments will occur on the same dates as the original systematic Withdrawals would have occurred, rather than the last day of the first full Contract Year following the date the Rider enters Automatic Periodic Benefit Status. After this Rider enters Automatic Periodic Benefit Status, the MGWB Periodic Payments and this Rider terminate when the Annuitant dies. If MGWB Periodic Payments are disbursed after the death of the Annuitant, but before we are notified of such death, we reserve the right to recover, and you agree to repay to us, such MGWB Periodic Payments.

If the MAW exceeds the net Withdrawals for that Contract Year in which the Rider enters Automatic Periodic Benefit Status, including the Withdrawal that caused the Rider to enter Automatic Periodic Benefit Status, the excess of the MAW over such net Withdrawals will be paid at the end of the Contract Year to the Owner.

If the Contract's Accumulation Value is reduced to zero by a Withdrawal which exceeds the MAW, the Contract and this Rider will terminate due to the pro-rata reduction described above under the Treatment of Withdrawals section.

If the Accumulation Value is reduced to zero (other than by a Withdrawal exceeding the MAW) and a Cash Surrender Value still exists while the Rider is in Guaranteed Withdrawal Status, the Owner may elect to Surrender the Contract instead of entering Automatic Periodic Benefit Status. This will terminate the Rider and no further benefits will be paid. The Owner may also elect to apply the remaining Cash Surrender Value to a Payment Plan. This will also terminate the Rider. If the remaining Cash Surrender Value is applied under the life only Payment Plan, the Rider will terminate and we will pay the greater of the annuity payout from the Contract and the annual payments equal to the MAW. If one of the above actions is not elected 30 days from the date of the notification letter from the Company to the Owner, the Rider will automatically enter Automatic Periodic Benefit Status and the Owner will only be entitled to MGWB Periodic Payments. If the Maturity Date is reached while the Rider is in Automatic Periodic Benefit Status, the MGWB Periodic Payments continue and the Rider remains in Automatic Periodic Benefit Status until the date of death of the Annuitant.

## 4. MGWB CHARGE

The MGWB Charge is deducted on each quarterly Contract Anniversary, in arrears, from the Contract's Accumulation Value elected to each Strategy in the same proportion that the total Accumulation Value elected to each Strategy bears to the Contract's total Accumulation Value. Deductions for the MGWB Charge will not reduce Minimum Guaranteed Strategy Values. The MGWB Charge Rate on the Rider Effective Date is stated in the Rider Data Table.

If the Contract to which this Rider is attached is terminated by full Surrender, cancellation or application of the Contract's Proceeds or Cash Surrender Value, as applicable, to a Payment Plan, the MGWB Charge for that portion of the current quarter completed will be deducted from the Contract's Accumulation Value prior to termination of the Contract. The charge for this Rider will continue to be assessed so long as this Rider is in effect, unless the Rider enters Automatic Periodic Benefit Status.

During the Guaranteed Withdrawal Status, if any Owner dies (Annuitant if any Owner is non-natural) and the Contract to which this Rider is attached is not continued by a surviving spouse, immediately prior to calculating any death benefit the Accumulation Value as of the date of death will be increased by an amount equal to the sum of all MGWB Charges collected since the Rider Effective Date, multiplied by the MGWB Reimbursement Percentage.

The MGWB Reimbursement Percentage will be reduced to zero at the earliest of the following events:
  (1) Commencement of Automatic Periodic Benefit Status;
  (2) Termination of the Rider other than by death of an Owner (Annuitant if any Owner is non-natural); or
  (3) Disbursement of an Excess MGWB Withdrawal prior to the date of death of any Owner (Annuitant if any Owner is non-natural).

The charge for this Rider will continue to be assessed so long as this Rider is in effect, unless the Rider enters Automatic Periodic Benefit Status.

## 5. DEATH OR CHANGE OF OWNER/ANNUITANT

**Death of Owner/Annuitant**

If this Rider is in Guaranteed Withdrawal Status the death of the Owner or the Annuitant (if any Owner is not an individual) will terminate this Rider. Charges for this Rider will cease on the date of death unless the Contract is continued by the surviving spouse. However, if the surviving spouse of the deceased Owner continues the Contract as their own, as provided in the Contract, this Rider also continues; provided:

    (1) The spouse is at least 50 years old on the date the Contract is continued; and
    (2) The spouse becomes the Annuitant and sole Owner.

If this Rider is in the Deferral Phase at the time of spousal continuation and no Withdrawal is made prior to the date the Rider is continued:

    (1) The Rider continues in the Deferral Phase; and
    (2) The MAW percentage will be determined on the continuing spouse's age at the time the initial MAW is calculated at the beginning of the Withdrawal Phase.

If this Rider is in the Withdrawal Phase at the time of spousal continuation or if a MAW is made prior to the date the Rider is continued if the continuing spouse had been the Annuitant prior to the date of death:

    (1) The Rider will be continued in the Withdrawal Phase.

If this Rider is in the Withdrawal Phase at the time of spousal continuation or if a MAW is made prior to the date the Rider is continued and the continuing spouse had not been the Annuitant prior to the date of death, the Rider terminates. If the Rider is in Automatic Periodic Benefit Status and the Annuitant dies, the Contract and this Rider terminate and are of no further value.

**Change of Owner/Annuitant**

Except as provided under the Death of Owner/Annuitant section, the Annuitant may not be changed. Except for the following specifically allowed transactions, any change in ownership will cause this Rider to terminate and no Rider benefits will thereafter be payable:

    (1) A change of ownership pursuant to spousal continuation as set forth in the Death of Owner/Annuitant section above;
    (2) A change of ownership from one custodian to another custodian;
    (3) A change of ownership from a custodian for the benefit of an individual to the same individual;
    (4) A change of ownership from an individual to custodian for the benefit of the same individual;
    (5) Collateral assignments;
    (6) A change of ownership from one trust to another trust and the grantor of the trusts are the same individual;
    (7) A change of ownership from an individual to a trust where the individual Owner and the grantor of the trust are the same individual;
    (8) A change in ownership from a trust to an individual where the individual Owner and grantor of the trust is the same individual; and
    (9) A change in ownership executed pursuant to a court order.

## 6. MISSTATEMENT OF AGE OR SEX

If the age or sex used in determining any benefits provided by this Rider have been misstated, the amounts payable or benefits provided will be those that this Rider would have provided at the correct age or sex. We reserve the right to recover, and you agree to repay to us, the amounts overpaid. We also reserve the right, alternatively, to recoup the amounts overpaid by reducing the MAW, future MGWB Periodic Payments or future payments under a Payment Plan.

## 7. RIDER TERMINATION

This Rider may not be cancelled unless the Contract is terminated, other than as described in the Guaranteed Withdrawal Status, Automatic Periodic Benefit Status, Death of Owner/Annuitant, or Change of Owner/Annuitant sections. This Rider has no Surrender Value or other non-forfeiture benefits upon termination.

Signed: *Joy M. Binney*

Secretary

(This page intentionally left blank.)

FLEXIBLE PREMIUM DEFERRED ANNUITY CONTRACT

Annuity benefit payable at Maturity Date.
Death benefit payable in event of the
Owner's death prior to Maturity Date.

NONPARTICIPATING

IU-IA-3033(CA)